IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


UNITED STATES OF AMERICA,

          Plaintiff,


          vs.                    Case No. 13-10112-01, 03, 04, 05, 06,

                                              07, 08, 10, 11, 12-JTM

GERALD BEASLEY, *et al.*

          Defendants.


MEMORANDUM AND ORDER


The defendants have filed a number of motions in the present criminal action presenting legal issues which the court finds may be resolved by the present Order.[1] The court will schedule separate hearings to address the issues surrounding other motions presented by the defendants,[2] as well as a hearing to address the admissibility of co-conspirator statements pursuant to *United States v. James*, 590 F.2d 575, 582 (5th Cir.1979).

---

[1] The defendants have also filed multiple motions, which have been granted by the court, joining in the substantive motions filed by their co-defendants. For ease of reference, the court in the present Order addresses each substantive motion by reference to the defendant originally filing that pleading.

[2] These motions are the Motions to Suppress (Dkt. 250, 274) relating to two warrantless traffic stop searches (occurring on June 3 and 10 of 2013), and the interception of an Express Mail package on February 13, 2013. (Dkt. 259).

*Wiretap Motions*

Evidence underlying the government's case was supplied in part my means of two authorized wiretaps. Wiretap Number 1 was directed at telephone number 316-409-4289, a cell phone issued to Gerald Beasley. The wiretap application was granted by Judge Eric Melgren, and the resulting warrant issued pursuant to 18 U.S.C. § 2518 authorized interception for 30 days. The interceptions occurred from March 26 to April 24, 2013. The affidavit by Special Agent Jason E. Fuller in support of the application for Wiretap No. 1 is 96 pages long.

Wiretap Number 2 was directed at telephone number 316-992-9165, a cell phone issued to Antoine Beasley. Pursuant to the warrant issued by Judge Melgren, investigators intercepted calls from May 8 to June 5, 2013. The 45-page affidavit in support of warrant was prepared by DEA Task Force Officer Kari Gourley.

Defendants challenge the interceptions conducted under both warrants pursuant to 18 U.S.C. § 2518(10)(a). (Dkt. 249, 251, 267). They argue that the warrants lacked probable cause, and also argue the wiretaps were not necessary, suggesting the police could have used "[t]raditional investigative techniques [which] include surveillance, infiltration or undercover work, questioning of participants, execution of search warrants, and the use of pen registers and trap-and-trace devices." *See United States v. Verdin-Garcia*, 516 F.3d 884, 889-890 (10th Cir.), *cert. denied*, 129 S. Ct. 161 (2008) (citing *United States v. Ramirez*, 479 F.3d 1229, 1240 (10th Cir. 2007) and *United States v. Ramirez-Encarnacion*, 291 F.3d 1219, 1222 n. 2 (10th Cir. 2002)).

2

Probable cause for a wiretap exists where an affidavit establishes that a particular offense has been, is being or is about to be committed, and that conversations related to the offense will be intercepted. *See United States v. Armendariz*, 922 F.2d 602, 608 (10th Cir. 1990). A wiretap is deemed necessary if "traditional investigative techniques have been tried unsuccessfully, reasonably appear to be unsuccessful if tried, or are too dangerous to attempt." *Ramirez-Encarnacion*, 291 F.3d at 1222 (citing 18 U.S.C. §2518[1][c] and 2518[3][c]). Once a wiretap has been authorized by a judge, it is presumed proper and the burden is on the defendant to prove its invalidity. *United States v. Radcliff*, 331 F.3d 1153, 1160 (10th Cir. 2003).

Moreover, the necessity requirement for a wiretap is read "in a common sense fashion," under which the court "consider[s] all the fact and circumstances of the case." *Ramirez-Encarnacion*, 291 F.3d. at 1222 (internal quotations and citations omitted). The necessity mandate does not require the exhaustion of all possibilities; the government satisfies the necessity element if it "demonstrates either [that] normal investigatory techniques have been tried and failed or that they reasonably appear to be unlikely to succeed if tried, or to be too dangerous to try. *United States v. Castillo-Garcia*, 117 F.3d 1179, 1187 (10th Cir. 1997).

Defendants argue with respect to Wiretap No. 1 that the affidavit lacks any probable cause to believe the telephone was being used in connection with a criminal enterprise. (Dkt. 249 at 5-7). They argue much of the information in the application was remote in time, and the target telephone number was mentioned only a limited number of times. They

further argue that the affidavit does not establish the necessity for a wiretap (*id.* at 9-21), because it fails to demonstrate that other investigative techniques were unavailable or unsuccessful, including the issuance of grand jury subpoenas, undercover investigations, physical surveillance, confidential sources, search warrants, "sneak and peak" warrants, fixed position cameras, or pen registers.

The application for Wiretap No. 1 relates the history of the alleged conspiracy involving defendant George Beasley in great detail, relating his activities in 45 separate factual allegations. A wiretap application cannot rest on dated or stale information. "The determination of timeliness, however, does not depend on simply the number of days that have elapsed between the facts relied on and the issuance of the warrant; instead, whether the information is too stale to establish probable cause depends on 'the nature of the criminal activity, the length of the activity, and the nature of the property to be seized.'" *United States v. Iiland*, 254 F.3d 1264 (10th Cir. 2001) (quoting *United States v. Snow*, 919 F.2d 1458, 1459-60 (10th Cir. 1990)). Here, while many of these activities occurred more than one year before the application for warrant, (such as the indication by pen register that Beasley used the cell phone to arrange purchases of crack cocaine), the application otherwise documents the existence of an on-going, open-ended criminal enterprise. Thus, the affidavit notes that Beasley had deposited some $400,000 in the bank in the three previous years, even though he had no apparent means of legitimate income.

The affidavit establishes that the target telephone number was indeed one of the numbers Beasley used. An anonymous source reported that Beasley was cashing fake

checks, and that the source knew the target telephone number belonged to Beasley. Further, the police knew of a series of text messages between Beasley and Gerald Parker relating to the apparent creation of a fraudulent check. Only a few months before the application, Parker had called Beasley on the target cell phone, telling him to "clean up," apparently a reference to eliminating evidence of criminal activity, because "this mother fucker done told everything."

On February 13, 2013, also only a few months before the warrant application, a package of marijuana was mailed to 655 N. Estelle, Wichita, Kansas — a residence owned by RELTSUH ("hustler" spelled backwards) a company owned and controlled by defendants Gerald and Antoine Beasley.

As noted earlier, the warrant is presumptively valid, and the burden is on the defendants to show the warrant was issued without probable cause. Further, in reviewing a challenge to the probable cause for a warrant, the court does not substitute its own judgment for that of the issuing magistrate. Rather, the court reviews the affidavit for the purpose of determining whether the magistrate's finding of probable cause has a substantial basis in the affidavit. *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983). The court finds that probable cause existed for the first wiretap warrant, and that the issuing magistrate's decision had a substantial basis in the facts set forth in the affidavit.

The defendants argue that probable cause does not exist with respect to Wiretap No. 2 for a variety of reasons. (Dkt. 251, at 7-14). They stress that the specific portion of the affidavit relating "to Antoine Beasley and his use of the Target Telephone #2 ... make up

5

a mere 10 pages of the application." (*Id*. at 7). Otherwise, the defendants dispute the inferences to be drawn for portions of the affidavit. They contend that one of the telephone numbers (206-313-8054) identified in the affidavit as contacting Beasley's telephone is actually, according to a T-Mobile response to a defendant's subpoena, a MSRN routing number rather than a T-Mobile subscriber. (*Id*. at 10). Thus, according to defendants "[i]t appears to be nothing more than an unfortunate coincident [sic] that the number appeared in the Tennessee wiretap and the pen registers of Antoine Beasley." (*Id*.)

The court finds that the arguments advanced by the defendants fail to obscure the probable cause amply demonstrated in the affidavit's lengthy factual recitation. Regardless of the specific source behind the 206-313-8054 Tennessee routing number, the fact remains that the affidavit establishes strong support for inferring the existence of probable cause. Moreover, the defendants have done nothing to show that, at the time of the affidavit, investigating officers had any knowledge or reason to suspect that the Tennessee number was a routing source rather than one specific subscriber number.

More importantly, the nature of the 8054 calls supported a finding of probable cause. For example, a caller using the Tennessee number inquired from an associate, Larry Bailey, about the sale of "H" or heroin, with Bailey responding that "he is going to get some of that shit." On another occasion, the apparent 8054 caller told Bailey, "tell your brother I'm fixing to need them 200 today." The 200 is a reference to a drug traffic organization in Memphis, Tennessee, and the Memphis DEA Resident Officer reported that "Bailey's main supplier for cocaine [was] Antoine Beasley using Telephone #2." (Aff. ¶ 22).

6

The affidavit also relates the existence of other information indicating the maintenance of an ongoing drug trafficking operation, including the results of physical surveillance.

> Special Agent Brian Alwes observed a Ford F-150, normally utilized by Antoine Beasley, arrive at 655 North Estelle and one of the occupants was observed carrying some sort of bag into the residence. The truck was than observed traveling to 1122 North Piatt, another known stash house. At 1122 North Piatt a passenger in the F-150 exited the vehicle and got into a white Grand Am parked at the residence. The white Grand Am then returned to 655 North Estelle and was observed meeting with a bald Hispanic male driving a silver Honda Ridgeline registered to a Juan J. Ibarra. Juan Ibarra was observed carrying some sort of bag out of the residence on Estelle.

(*Id*. ¶ 23). Independent evidence showed that Ibarra was involved in the drug trade, and that he and his two brothers "were involved in transporting multiple kilograms loads of cocaine to Wichita, Kansas on a weekly basis and then transporting US currency back to El Paso." (*Id*.). Other surveillance of Antoine Beasley reported that the defendant was driving his truck from one of the alleged stash houses, driving away, and subsequently placing trash bags from this truck into a dumpster on North Woodlawn. The bags included other bags with a white powder, and one bag marked "O.G. Kush" which tested positive for marijuana residue.

The defendants question specific aspects of the affidavit on an individual basis. For example, they ask, "Was it actually Juan Ibarra at North Estelle or was it just someone driving a vehicle register [sic] to him?" Or, the defendants note, another portion of the affidavit discusses surveillance observed Antoine Beasley carrying a "blue or purple" laundry bag from his maroon truck into the 655 Estelle residence, while later in the day

> a white Grand Prix arrives at 655 Estelle along with a silver Honda Ridgeline truck. The truck backs in the drive very close to the car. The driver of the car, a black male, opens the trunk of the car. The driver of the trucks meets the driver of the car and they both walk into the house. The same person is seen *carrying a large white laundry style bag into the residence.*

(Dkt. 251, at 24 (emphasis added by defendants).

But in deciding the question of probable cause, the court does not address each individual portion of the affidavit separately to determine if a fact is proven beyond a reasonable doubt. Rather, it addresses the affidavit as a whole, seeking to determine whether the document establishes a reasonable probability that a particular offense has been, is being or is about to be committed, and that conversations related to the offense will be intercepted.

The affidavit in support of the wiretap clearly meets this standard. The affidavit's inference that Juan Ibarra was driving the pickup truck registered to him is entirely reasonable, and is consistent with other evidence indicating the drug trafficking operations of the Ibarra brothers. Nothing in the minor ambiguities noted by the defendants detracts from the probable cause set forth in the affidavit.

Moreover, the affidavit for Wiretap No. 2 also incorporates the results of the intercepts from Wiretap No. 1. As noted separately, the court finds no basis for suppressing the results from the first wiretap. The surveillance, intercepts, and other information in the affidavit support a finding of probable cause.

The court also denies the motions to suppress, finding that the applications not only show probable cause but also the necessity of the wiretaps. As a result, the warrants were

properly issued.

In reaching this conclusion, the court finds that defendants have failed in their burden of demonstrating that the affidavit was not supported by a showing of necessity. The court bears in mind that

> "necessity" is not an "exhaustion" requirement. "In examining necessity challenges to wiretap orders, we have repeatedly held that law enforcement officials are not required 'to exhaust all other conceivable investigative procedures before resorting to wiretapping.'" [*United States v.*] *Edwards*, 69 F.3d [419,] 429 [(10th Cir. 1995)] (quoting *United States v. Apocada*, 820 F.2d 348, 350 (10th Cir. 1987)). "Instead, we require the government to prove exhaustion — either by attempt or explanation of why the method would not work — of all 'reasonable' investigatory methods." *United States v. Mesa Rincon*, 911 F.2d 1433, 1444 (10th Cir. 1990). The government's failure, however, to deal with one or more specified categories of normal investigative techniques "will not be fatal to its wiretap application if it is clear, under the government's recitation of the facts of the case, that requiring the government to attempt the unexhausted and unexplained normal investigative techniques would be unreasonable." [*United States v.*] *Castillo-Garcia*, 117 F.3d [1179,] 1188 [(10th Cir. 1997), *overruled on other grounds, Ramirez-Encarnacion*, 29 F.3d at n. 2)].

*United States v. Arrington*, 2000 WL 775576 (10th Cir. 2000), *overruled on other gds., Ramirez-Encarnacion*, 291 F.3d at 1219. The requirement of necessity does not require the "indiscriminate pursuit to the bitter end of every non-electronic device … to a point where the investigation becomes redundant or impractical or the subjects may be alerted and the entire investigation aborted." *United States v. Small*, 229 F.Supp.2d 1166, 1178 (D.Colo. 2002) (citing *United States v. Bennett*, 219 F.3d 1117, 1122 (9th Cir. 20000), *aff'd in part, rev'd in part, United States v. Hall*, 473 F.3d 1295 (10th Cir. 2007). Further, as with a probable cause determination, the issuing magistrate's finding of necessity is also entitled to substantial

deference by a reviewing court. *See United States v. Wagner*, 989 F.2d 69, 71 (2d Cir.1993).

The court has reviewed the lengthy applications for warrant in detail. Both applications document the history of the government investigations of Gerald and Antoine Beasley for crimes including fraud and drug trafficking, conducted as part of an extensive and ongoing criminal enterprise. The defendants' attempts to second-guess the affidavit by suggesting alternative police methods fails to meet their burden.

For example, the defendants suggest (Dkt. 249, at 10) that the investigating officers could have simply spoken with Beasley, and not simply assumed he would have invoked his right to refuse to speak to them. Alternatively, defendants argue, "immunity can be used to obtain information that would otherwise be protected." (*Id.*)

As noted earlier, the determination of necessity in an affidavit is judged on the basis of common sense, and alternative investigative techniques are not necessary where they are unlikely to proceed. The affidavit in support of Wiretap No. 1 states:

> 43. Based on affiant's training and experience, affiant believes interviews of additional TARGET SUBJECTS or their known associates would produce insufficient information regarding the identities of all persons involved in the conspiracy, including, but not limited to, sources, transporters, financiers, distributors, and customers for controlled substances as well as co-conspirators involved in fraud. In addition, affiant believes that any responses to any interviews of the TARGET SUBJECTS at this stage of the investigation would contain a significant number of untruths, diverting the investigation with false leads or otherwise frustrating the investigation. Furthermore, affiant believes such interviews would also have the effect of alerting other members of the conspiracy, thereby compromising the investigation and possibly resulting in destruction or concealment of relevant evidence and the possibility of harm to cooperating sources whose identity may become known.

10

44. Grand jury subpoenas suffer from the same limitations as interviews discussed above. Based on affiant's training and experience, affiant believes that the TARGET SUBJECTS and/or and their co-conspirators would likely be uncooperative and invoke their Fifth Amendment privilege not to testify if called to testify before a grand jury.

45. Grants of immunity would not be appropriate at this stage of the investigation because immunity would foreclose the prosecution of principle [sic] members of this conspiracy and would not ensure the receipt of truthful testimony before a grand jury. In addition, it would be unwise to seek grand jury immunity for the TARGET SUBJECTS or their co-conspirators as that would likely foreclose prosecution of some of the most culpable persons involved in the conspiracy.

These factual averments — that directly questioning the target subjects would endanger rather than advance the investigation — is consistent with both common sense and with the other evidence in the case.

In reviewing the defendants' challenge to the probable cause findings of the magistrates issuing the respective warrants (both the warrants immediately at issue and those challenged through other motions), the court bears in mind the strong preference for searches executed by warrant, and for the corresponding deference to the findings by those magistrates.

Once a magistrate judge determines probable cause exists, the role of a reviewing court is merely to ensure the Government's affidavit provided a "substantial basis" for reaching that conclusion. [*Illinois v. Gates*, 462 U.S. 213,] 238-39, 103 S.Ct. [103 S.Ct.2317,] 2317 [(1983)]. "[A]fter-the-fact, de novo scrutiny" of a magistrate's probable-cause determination is forbidden. [*Massachusetts v.*] *Upton*, 466 U.S. [727,] 733, 104 S.Ct. 2085 [(1984)]. Provided the magistrate judge's "neutral and detached function" has been properly fulfilled, we accord a magistrate judge's probable-cause finding "great deference." *Gates*, 462 U.S. at 236, 240, 103 S.Ct. 2317; see *also United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) (noting that magistrate judges may "not serve merely as a rubber stamp for the police").

*United States v. Biglow*, 562 F.3d 1272, 1280-81 (10th Cir. 2009).

As noted above, the investigators already had knowledge that Beasley would seek to"clean up" evidence of criminality to avoid detection. The false check enterprise itself was grounded on deception and fraud. The affidavit quite reasonably concluded that directly approaching the target subjects would accomplish nothing more than tipping the defendants off that an investigation was under way. Further, the affidavit reasonably concluded that offers of immunity would be premature, since these might be extended to potential ringleaders of the criminal enterprise.

The defendants complain that the affidavits use similar language to that contained in other wiretap applications. But such similarity does not establish that the underlying information is intentionally false or recklessly misleading. To the extent that there is some similarity, this is simply a function of the fact that the circumstances of the particular cases are closely aligned. Given the state of the investigation and nature of the specific underlying criminal enterprise, directly questioning the target subjects would be likely counterproductive.

The affidavits also reasonably and fully document why additional investigative techniques such as undercover law enforcement agents, physical surveillance, search warrants, camera surveillance, or pen registers would be unlikely to succeed.

The investigation had used undercover agents to make some contact with Beasley and one had purchased cocaine from an associate of Beasley, but the technique was unlikely to provide any important information as to the primary members of the Beasley

12

family enterprise. Rather, the affidavit established, such agents — at considerable danger — would at most gain the confidence of lower-level members, and even then would gain only fragmented knowledge of the larger criminal enterprise. Confidential informants were unavailable, and in any event would suffer from the same limitations faced by undercover agents.

Similarly, the affidavit documents numerous instances of surveillance of Gerald Beasley, indicating his presence at various locations associated with drug trafficking. However, continued surveillance was not likely to achieve a full picture of the defendant's activities. Surveillance alone, whether by agents or by fixed position video cameras, would not explain the reasons for Beasley's meetings with his associates. Further the need to conduct such surveillance discretely prevented investigators from knowing what was actually said at these meetings. Similarly, pen registers or other devices were used, but these gave only very limited information as to the activities of the target subjects. Only electronic surveillance could supply information as to the content of these conversations.

The affidavit documents that the investigation had obtained some information through the use of search warrants in the past. For example, as noted below, a search of 660 N. Estelle had occurred following a report of an assault at the residence. However, while these had yielded some information, they did not and could not fully explore the nature of the alleged on-going criminal enterprise. Further, the investigators had information that Gerald Beasley frequently changed the place where he conducted his drug operations. The affidavit reasonably observed that additional search warrants were unlikely to produce

detailed records of specific drug transactions, and would only serve to alert the target subject of the federal investigation.

Defendants disparage the investigator's explanation for the reasons alternative investigative techniques were unlikely to succeed by claiming that "[i]t would seem that the government is under the impression that if an investigative technique will not present them the case on a silver platter, it need not be pursued and automatically entitles them to a wiretap." (Dkt. 249, at 18). This straw man, of course, does not reflect the actual position of the affidavit or the government, and misstates the law. As noted earlier, the necessity requirement does not require the use of redundant or impractical actions which are unlikely to succeed or which may endanger an investigation. Necessity exists if normal techniques have been tried unsuccessfully, appear unlikely to succeed, or are too dangerous to attempt. And the burden is on the defendants to show that the affidavit failed to establish necessity under the particular facts of the case, judged in the light of common sense. The defendants have not met this burden.

The court finds that the same considerations support a determination of necessity for Wiretap No. 2. Having carefully reviewed the lengthy affidavits in support of both wiretaps, the court finds that ample probable cause existed for issuance of both warrants.

Finally, the court finds no basis for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). Such a hearing may be required where defendants make some showing that the affidavit rests on intentional, knowing, or reckless false statements or omissions. The warrant is presumed valid, and a *Franks* hearing is not required where defendants

challenge an affidavit by conclusory allegations or speculation. Defendants must point to those portions of the affidavit which are false, and present some form of proof why the allegations are in fact untrue. *See United States v. Anderson*, 243 F.3d 478, 482 (8th Cir. 2001). A *Franks* hearing is not required where, as here, there is simply no proof that the affiant lied or recklessly disregarded the truth. *United States v. Moore*, 129 F.3d 989, 992 (8th Cir. 20010). The defendants have made no attempt to show that the affidavits contained any material false statement, made knowingly and intentionally, or with reckless disregard for the truth, which was essential to the finding of probable cause.

### *Forensic Examination of Electronic Devices*

The defendants challenge the forensic examination of devices seized at various times. Antoine Beasley seeks to suppress any information obtained from approximately seven cell phones and ten computers which were seized June 12, 2013 from his residence at 618 Hedgewood in Andover, Kansas in separate seizures occurring in 2013, as well as other devices seized in 2014. (Dkt. 261, 263). Defendant Gerald Beasley challenges the examination of one cell phone and nine computers from 1339 N. Hillside, five cell phones and two other electronic devices from 1122 N. Piatt, and one cell phone, five electronic devices, and other electronic media from 2001 N. Colt. (Dkt. 284). Gerald Beasley also challenges the examination of two cell phones seized at the time of his arrest on June 12, 2013. (Dkt. 285).

The examination of devices obtained from the defendants' residences occurred

pursuant to warrant, which specifically authorized investigating officers to seek "electronic information that would reveal evidence of drug trafficking, fraud, or money laundering, including but not limited to data stored on digital devices, computers, data storage devices, telephone answering machines, caller ID boxes, faxes, cellular phones, pagers, and personal digital assistants (PDAs)." The cell phones found on Gerald Wilson at the time of his arrest were searched pursuant to a subsequent warrant, issued on July 15, 2013, which authorized the police to search for:

> evidence of drug trafficking, fraud, money laundering, or illegal possession of firearms, including, but not limited to:
>
> a) any and all names and/or aliases, addresses, telephone numbers, stored images, and/or other information, which identifies possible associates and/or co-conspirators;
>
> b) any and all names and/or aliases, addresses, telephone numbers, dates of calls, and/or duration of calls, which identifies calls made to and/or from the cell phones;
>
> c) any and all stored voice mail, text messages, and/or emails;
>
> d) any and all stored images, photos, videos, and pictures;
>
> e) digital or electronic information stored inside the subject cell phones.

To some extent, all of the defendant's motions rely on United States Magistrate Judge Waxse's decision in *In re Search of A Nextel Cellular Telephone*, No. 14–MJ–8005, 2014 WL 2898262, 2014 U.S. Dist. LEXIS 88215 (D. Kan. June 26, 2014), which rejected an application to search certain seized telephones on the grounds that the proposed electronic search was insufficiently narrow. *See also In re: Cellular Telephones within Evidence Facility*

*Drug Enforcement Administration, Kansas City District Office* 14-M-8017-DJW.

Antoine Beasley and Gerald Beasley also argue that the examination of the devices seized from the residences should be suppressed pursuant to the Supreme Court's observation in *Riley v. California*, __ U.S. _, 134 S.Ct. 2473, 2494-95 (2014) that "[m]odern cell phones are not just another technological convenience" but "hold for many Americans 'the privacies of life.'"

*Riley* does not compel suppression, however. In *Riley* the Court simply recognized the general privacy interest in cell phones, and observed that "a warrant is generally required before such a search, even when a cell phone is seized incident to arrest." *Id.* at 2493. The devices from the defendant's residences, of course, were not seized by a search incident to arrest. They were obtained by search warrant, with the issuing magistrate specifically authorizing the recovery of "electronic information that would reveal evidence of drug trafficking, fraud, or money laundering, including but not limited to data stored on digital devices, computers, data storage devices, telephone answering machines, caller ID boxes, faxes, cellular phones, pagers, and personal digital assistants (PDAs)."

This court has previously explained why *Nextel* provides little support for a challenge to a search which was been conducted pursuant to a validly issued warrant:

> In *Nextel*, the Magistrate Judge declined to authorize a search warrant based upon concerns that the methodology for the search submitted by the government was imprecise and might collect information unrelated to the criminal investigation. But while this may have been a wise and appropriate resolution to the warrant request before him, this case is of course in an entirely different posture.
>
> In *Nextel*, the government was free to submit a new and corrected

17

> warrant application. Here, the magistrate already issued the search warrant. Accordingly, this court views the decision to grant the warrant with great deference. *United States v. Martinez*, 764 F.2d 744, 746 (10th Cir.1985) (quoting *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). *Nextel* is simply not controlling here. Rather, as the Tenth Circuit has observed, a "computer search may be as extensive as reasonably required to locate the items described in the warrant." *United States v. Burgess*, 576 F.3d 1078, 1092 (10th Cir.2009).

*United States v. Cukurs*, No. 14-10199-JTM, 2015 WL 5883904, *7-8 (D. Kan. Oct. 8, 2015).

Other courts have reached similar conclusions. *See United States v. Garcia-Alvarez*, 2015 WL 777411, *4-5 (S.D. Cal. Feb. 24, 2015) (noting *Nextel* and observing that while "it may have been better if the warrant had included a search protocol that minimized unnecessary intrusion ... the absence of such a protocol did not render the warrant constitutionally defective" under the Fourth Amendment, "and, even if it had been, the good-faith exception applied").

A warrant is valid if it "enables the searcher to reasonably ascertain and identify the things authorized to be seized." *United States v. Riccardi*, 405 F.3d 852, 862 (10th Cir. 2005). Thus, "[e]ven a warrant that describes the items to be seized in broad or generic terms may be valid when the description is as specific as the circumstances and the nature of the activity under investigation permit." *Id.*

The court finds that the warrants issued in the present case were sufficiently particular as to the information to be seized. As this court noted in *Cukurs*, under *Burgess*, forensic electronic examination "may be as extensive as reasonably required to locate the items described in the warrant." 576 F.3d at 109. "This court has never required warrants

18

to contain a particularized search strategy.… Rather, the limitation on the scope of this search was explicitly constrained by content — computer files containing evidence of drug use or trafficking." *Id.* at 1093.The court finds that the warrants for the search of electronic devices meet the standards set forth by the Tenth Circuit.

Additionally, the defendants cite *United States v. Carey*, 172 F.2d 1268 (10th Cir. 1999), but this decision bears no factual resemblance to the present case.. In *Carey*, the investigating officers only had a warrant to search the defendant's house for evidence of drug trafficking; the defendant separately gave consent that for the "removal of a computer" from the house to another location. He gave no consent to search the computer. The police subsequently examined the computer and discovered no evidence of drug trafficking. However, they continued to examine the computer, and after a search of some five hours, found evidence of child pornography. At no point did the police seek or obtain any warrant for the examination of any electronic devices.

In the present case, of course, the government obtained separate warrants authorizing the examination of electronic devices seized from the defendants. They obtained these warrants prior to the forensic examinations. And the examinations revealed evidence of the same type of crimes (financial fraud and drug trafficking) which were the subject of the original investigation.

The court finds that the affidavits underlying the warrants provided ample probable cause for the respective searches. The evidence showed that 681 Hedgewood was the daily residence of Antoine Beasley, that he likely was engaged in drug trafficking, that he have

19

very little reported income (some $17,000 per year) but had acquired somehow a large number of real estate properties, apparently as the result of a money laundering operation. Other evidence indicated that the defendant was engaged in a scheme involving the trafficking of EBT cards, and that he kept financial records at the residence. And the affiant indicated that in his experience with similar criminal activity, evidence of the operation would likely be found at the defendant's residence.

The information in the affidavit included acts of drug trafficking, drug use, and the purchase of ammunition in May of 2013, only shortly before the search warrant was issued. Finally, the affidavit supplied probable cause to believe that information relating to the financial fraud and drug trafficking would likely be maintained or documented in electronic form, justifying a search of the residence at 618 Hedgewood and electronic devices recovered from the residence.

The court has reviewed the affidavits underlying the warrants, and finds that the issuing magistrate's determinations of probable cause for the search of electronic devices had a substantial basis in fact.

Next, both Antoine and Gerald Beasly further argue that the affidavit established probable cause only to search the two phones that were specifically the targets of the two wiretaps, and not what Antoine Beasley acknowledges was "the myriad of cell phones and electronic devices" the defendants had in their possession. (Dkt. 261, at 10). The defendants supply no authority for their contention that probable cause for the search of electronic devices is restricted only to devices with approved wiretap orders. As to each of the warrants, the

20

respective affidavit established that the defendants were likely involved in a criminal enterprise, that the defendants used a given phone as a part of the criminal enterprise, and that, based upon the experience of the affiant, additional information would likely be found in the target residences generally, and in any other electronic devices found therein.

Finally, Antoine Beasely argues that the warrant had expired, repeating a similar argument advanced below by Gerald Wilson (Dkt. 248) with respect to the items seized by police from 660 N. Estelle. The court denies the motion to suppress for the same reasons set forth below it its discussion of Gerald Wilson's motion.

The warrant was indeed executed, and the electronic devices were seized and placed into police custody on June 12, 2013, well before the June 21, 2013 deadline specified in the warrant. The warrant did not expressly mandate any deadline for the subsequent forensic examination of the devices seized, and, as noted elsewhere in this opinion, the timeliness requirement for execution of warrants in general is explicitly inapplicable to the "later review" of "electronic storage media ... or electronically stored information." Rule 41(e)(2)(B). Accordingly, the court finds that probable cause exists as to the 2013 search of 618 Hedgewood and its contents, and denies defendant Antoine Beasley's motions to suppress. (Dkt. 261, 263).

### Search of 660 N. Estelle

On May 24, 2009, Wichita police officers responded to a report of a battery at the residence. The officers arrived to find a woman laying in the front yard with multiple stab wounds. The woman, Nicole Vann, told the officers that she had been stabbed by another woman, who had then gone inside the house. A friend of Vann's, Ishii Carter, reported that

the woman had also struck Vann with a stick or crow bar.

The officers met defendant Gerald Wilson on the front porch. According to the officers, Wilson was uncooperative, and refused to tell them how many people were inside the house. The officers observed video cameras on two sides of the front porch, and believed that the scene may have been recorded on equipment inside the house.

The officers arrested Wilson, and conducted a sweep of the house. They found three children in the living room, and Wilson's girlfriend, Tanesha Walters, in a bedroom. During the course of the sweep, the officers noticed a knife in the drying bin next to the kitchen sink, which appeared to be wet. On the dining room table, they saw a cigarette roller, plastic baggies, and a butane lighter, which they believed indicated drug use or distribution.

The police arrested both Vann and Walters. In addition, they applied for a warrant, seeking:

1) Indicia of occupancy, residency, ownership, management and/or control of the premises described above including but not limited to utility and telephone bills, canceled envelopes, keys and access cards;

2) Knives, blades or any cutting instrument that could be used to pierce human flesh;

3) Crow bars, pry bars, batons [] or sticks;

4) Trace evidence including blood, hairs, fingerprints and fibers;

5) Video cameras, photographic cameras, film, video tape, digital recorders, video cassette recorders and/or any media that can be used to save electronic data:

6)  Photographs and diagrams;

7)  Keys;

8)  Illegal drugs/narcotics/marijuana and related paraphernalia such as cigarette rollers, rolling papers, plastic baggies, lighters, pipes, steel wool (filters) and push rods;

9)  Address and/or telephone books and any papers reflecting names, addresses, telephone number; Caller ID records, pager numbers, of co-conspirators, sources of supply, customers, and other individuals or businesses connected with the sale of illegal drugs/narcotics/marijuana;

10) Cell phones.

The warrant was executed the following day, and officers recovered the knife. They also found a white towel with blood on it, six cell phones, two pounds of cocaine, drug paraphernalia, United States currency and a safe. The police obtained a second search warrant for the safe, which was found to contain a firearms and ammunition.

Wilson seeks to suppress the results of these searches, based on two arguments. First, he contends the search of the cell phones seized from the residence was invalid, because the search occurred under an expired warrant. (Dkt. 247). Second, he argues that the protective sweep exceeded the permissible scope permitted under *Maryland v. Buie*, 494 U.S. 325, 327 (1990). (Dkt. 248).

Wilson's first argument relies on the standardized form warrant, which authorized a search within ten days of its issuance. However, he notes, the return of warrant indicates that the electronic search of the cell phones occurred "[o]n March 3, 2014," when "the data stored in a binary form was seized, by forensic means, from the six cellular devices." Thus,

23

the forensic examination took place twelve days after the warrant was issued.

The court finds that the motion to suppress should be denied. Here, the Warrant (issued by United States Magistrate Judge Kenneth Gale) does not actually have any specified date for completion. Rather, the form, simply provides that officers are "to execute this warrant before _____ (*not to exceed 10 days*)." (Emphasis in form).

The form was left blank, and the Magistrate Judge specified no explicit time for the warrant to be executed. The form is premised on an earlier version of Fed.R.Crim.Pr. 41(e)(2)(A)(I), which authorized a 10-day period for execution. Under the contemporaneous version of the Rule, warrants may be issued up to "14 days." The execution of the warrant was not untimely under either the Rule or under the Fourth Amendment itself. "The Fourth Amendment does not specify that search warrants contain expiration dates." *United States v. Sims*, 428 F.3d 945, 955 (10th Cir. 2005).

To the extent there was an ambiguity created when the Magistrate Judge did not complete the form, this does not warrant suppression of the evidence. Under similar circumstances, in *United States v. Hugoboom*, 112 F.3d 1081 (10th Cir. 1997), the court held that a warrant issued without any explicit expiration date did not compel suppression, as there was no evidence of separate prejudice to the defendant due to the delay, or evidence of deliberate misconduct by the officers involved.

Finally, even if all of the above were not true, suppression of the data from the cell phones would not be warranted. The cell phones themselves were seized from the residence within hours of the warrant being issued. There was no delay of even a single day.

The delay exists only in the forensic electronic examination of the cell phones. Rule 41 has an explicit provision governing such forensic examinations. Rule 41(e)(2)(B) provides:

> **Warrant Seeking Electronically Stored Information.** A warrant under Rule 41(e)(2)(A) may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information. Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant. The time for executing the warrant in Rule 41(e)(2)(A) and (f)(1)(A) refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review.

Thus, under this provision the electronic examination of seized electronic devices can take place outside the 14-day period otherwise contemplated by Rule 41(2)(A).

The court also denies defendant's motion to suppress as to the sweep of the house following the arrests. Wilson makes no substantial argument in favor of the motion other than noting that the application for warrant reports that "Sergeant Colin Gallagher conducted a protective sweep of the 660 N. Estelle upon the arrest of Wilson and observed a knife in the kitchen next to the sink. The sink had water in it and the knife was in a drying bin next to the sink as if it had just been washed." Based on this, Wilson stresses that the sweep occurred after Wilson and Walters were arrested.

The government does not dispute this chronology, but notes that a protective sweep under *Buie* may occur prior to an arrest. *See United States v. Torres-Castro*, 470 F.3d 992 (10th Cir. 2006). The government stresses that the sweep was extremely brief, and that at the time of incident, the officers knew there had been an violent confrontation resulting in a stabbing, that Wilson appeared to be uncooperative and refused to indicate how many adults were in the house, and that Walters was apparently hiding in a bedroom.

25

As an incident to a lawful arrest, officers may conduct a quick and limited protective sweep of a residence. *See Buie*, 494 U.S. at 327. This doctrine is founded in safety concerns: "The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter." *Id.* at 333. In particular, courts have recognized that such a risk may be present when officers arrest suspects in their own residence because "[o]fficers within the home of an arrestee may be particularly vulnerable to a dangerous confederate out of sight within the home." *United States v. Carter*, 360 F.3d 1235, 1242 (10th Cir.2004).

> A protective sweep is a brief search of a premises during an arrest to ensure officer safety if the officers have a reasonable belief of danger. The Fourth Amendment allows a protective sweep if police have a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrants the officer in believing that the area swept harbors an individual posing a danger to the officer or others. Protective sweeps are justified by the interest of the officers in assuring themselves that the premises are not harboring other persons who are dangerous and who could unexpectedly launch an attack. Thus, a protective sweep is appropriate only where officers reasonably perceive an immediate danger to their safety. We should evaluate the circumstances as they would have appeared to prudent, cautious and trained officers.

*United States v. Garza*, 125 Fed. Appx. 927, 931 (10th Cir. 2005) (internal citations omitted).

Here, at the time the officers completed the sweep, they did not know if there were any other victims or anyone in the residence that posed a danger to law enforcement or other individuals. They had certain knowledge only that an occupant of the house had inflicted potentially life-threatening injuries on another on the front porch or in the front yard, and then retreated inside the house. The protective sweep was very brief, and there

is no indication the officers paused to look for evidence.

Alternatively, as the government notes, the sweep was justified under the exigent circumstances doctrine. *See Mincey v. Arizona*, 437 U.S. 385, 392-93 (1978) (officers arriving at scene of a violent attack "may make a prompt warrantless search of the area to see if there are other victims").

The officers here had a reasonable basis for seeking to determine if other victims were in the house. At the time, the officers knew that an extremely violent attack had occurred involving a knife and a crowbar or similar weapon. They had a reasonable basis for quickly determining if any one else in the house had been attacked. *See, e.g., United States v. McKee*, ___ F.Supp.3d ___, ___, 2016 WL 320124, *10 (D. Nev. Jan. 26, 2016) ("officers were justified in doing a prompt warrantless search of the home to determine if a killer occupied the house or if other victims were present," after following trail of blood from stabbing victim to house, and finding defendant at door uncooperative).

Moreover, the evidence is also admissible under the doctrine of inevitable discovery. Such evidence is admissible if the government can show the existence of an "investigation that inevitably would have led to the evidence ... independent of the constitutional violation." *United States v. Larsen*, 127 F.3d 984, 987 (10th Cir. 1997). The inevitable discovery exception to the warrant requirement applies if law enforcement officers had probable cause to obtain a warrant before the unlawful search, and the government proves that the officers would have obtained the necessary warrant absent the illegal search. *United States v. Souza*, 223 F.3d 1197, 1203-04 (10th Cir. 2000). The government must show that probable cause

existed for such a search "plus a chain of events that would have led to a warrant independent of the search." *Id.* at 1204. "The key issue…is how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to the warrant." *Id.*

The present case supports application of this exception. At the time immediately following the arrest of Wilson and Walters, the officers knew that evidence of an aggravated battery — the knife and the crowbar — were likely located inside the residence. Very strong probable cause existed for the finding of this evidence in the house, even apart from the observations of the officers during the protective sweep. Moreover, the officers quickly began the warrant process, and a warrant was indeed obtained for a search. There is no indication that the investigating officers otherwise "lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli." *Souza*, 223 F.3d at 1204.

### 655 N. Estelle

Antoine Beasley challenges the June 12, 2013 search of 655 N. Estelle, arguing that the affidavit in support of the warrant authorizing the search lacked probable cause. (Dkt. 258). The defendant's motion largely rests on the success of his motion seeking to exclude the wiretap evidence, and his argument that the portions of the affidavit reciting what was heard during the wiretaps should be stricken as fruit of the poisonous tree.

As discussed elsewhere in this opinion, the defendants have failed in their burden

to show the wiretaps were improper. The court finds that the wiretap evidence sets out ample probable cause for the search of 655 N. Estelle.

As to the remaining facts recounted in the affidavit, Beasley attempts to challenge these one at a time. For example, with respect to the suspicious behavior by Antoine Beasley and known drug trafficker Juan Ibarra observed by police surveillance, Beasley claims that "[t]he questions are endless," and indeed proceeds to ask as many questions as possible: "Who was the occupant that got out of the truck?; Was it the passenger or the driver?; Was it Antoine Beasley or someone else?; Was Antoine Beasley even present?" (Dkt. 258, at 4). Later, noting an apparent attempt by Beasley to dispose of garbage containing evidence of drug trafficking by driving to an dumpster on North Woodlawn, Beasley stresses that he was seen stopping at an intermediate location between the residence at 655 N. Estelle and the dumpster — raising the possibility that the bag was actually from the intermediate location. Accordingly, he argues, there was no probable cause for the search of the residence.

However, as noted elsewhere in this opinion, probable cause is a flexible determination based upon a common sense interpretation of the facts of the case. *See United States v. Janus Industr.*, 48 F.3d 1548, 1552 (10th Cir. 1995). Probable cause is "more than mere suspicion but less evidence than is necessary to convict." *United States v. Burns*, 624 F.2d 95, 99 (10th Cir. 1980).

The defendant's inquiries may be properly advanced at trial, and the jury may assign them the appropriate weight. The affidavit demonstrates that police surveillance observed

multiple instances in which the residence at 655 N. Estelle was apparently used as a base of operations for drug trafficking. For present purposes, the most reasonable and common sense conclusion to be drawn from the affidavit in support of warrant is that Antoine Beasley was involved in an ongoing drug trafficking operation at the time of the warrant, and that he conducted at least a portion of this business from 655 N. Estelle.

### Search of 1122 N. Piatt and 1339 N. Hillside

Gerald Beasley challenges the June 12, 2013 search of 1122 N. Piatt and 1339 N. Hillside, which were conducted pursuant to warrants, as not founded on probable cause. (Dkt. 275). Like Antoine Beasley's motion as to 655 N. Estelle, the present motion relies on the assumed elimination of the wiretap evidence, coupled with claims that the remaining evidence in the affidavit was stale or unreliable.

The court hereby denies the motion. The wiretaps were lawfully issued, and the evidence obtained from those intercepted calls fully supplies probable cause for the resulting search warrant.

The court further finds unconvincing the defendant's attempts to discount the validity of other facts presented in the affidavit. For example, Gerald Beasley correctly notes that some of the information contained in the affidavit, such interviews describing his drug trafficking operation, occurred months before the warrant was issued. He also challenges one interviewee, Shannon Dameron, as "an alcoholic and addicted to crack," and another, Terry Ross, as an alleged criminal confederate who was recently arrested and "was angry

at Gerald Beasley for not posting [his] bond." (Dkt. 275, at 6).

Whether information in an affidavit is timely depends upon "the nature of the criminal activity, the length of the activity, and the nature of the property to be seized." *United States v. Shomo*, 786 F.2d 981, 983 (10th Cir. 1986). Evidence of ongoing activity permits the use of evidence from a broader time frame, "because evidence of a longstanding pattern of repeated activity makes it less likely that the activity has ceased within a short time frame." *United States v. Roach*, 582 F.3d 1192, 1201 (10th Cir. 2009).

Here, in the context of the extensive, long-standing, and on-going criminal operation otherwise documented in the affidavit, the cited evidence was not impermissibly stale. Standing alone, the interview of Ross, or the interview of Dameron, might not constitute probable cause. But, when combined with all of the other information in the lengthy affidavit, including the results of police surveillance and the wiretap intercepts, ample probable cause existed to believe that Gerald Beasley was involved in illegal activity, and that evidence of this activity would likely be found at the two locations. Collectively, the information, including that supplied by a trash pull, three informants, and an anonymous tip (which was generally corroborated by other information in the affidavit) supply probable cause for the warrants, even if the court were to conclude that the wiretap evidence should be excluded.

Because the court finds that the warrant for the search of each specific location was grounded on probable cause, it need not address the government's alternative argument that the evidence is independently admissible under the good faith doctrine.

31

*Search of 618 Hedgewood*

Defendant Antoine Beasley has moved to suppress the results of searches of the residence at 618 Hedgewood in 2013 and again in 2014 (Dkt. 260, 262). The first search occurred on June 12, 2013. The search was conducted pursuant to a warrant, which was premised on a lengthy, 23 page affidavit. The defendant argues in his motion that the warrant was not supported by probable cause to believe criminal activity would be found at the residence.

The court hereby denies defendant's motion, having previously found the existence of probable cause for the 2013 search in the context of defendant's separate motion (Dkt. 261) challenging the search of electronic devices found in the house. Evidence in the affidavit established that the residence was used in connection with the alleged financial fraud enterprise, including the maintenance of the enterprise's records. Further, the defendant used the residence as a base of operations from which he left to travel to other places to conduct drug transactions. Phone intercepts tied the defendant to the trafficking in EBT cards.

The 2014 search was conducted pursuant to a separate warrant. Officers arrived at the residence to serve an arrest warrant on the defendant early on the morning of April 9, 2014, and defendant asked to get some shoes and pants. When the officers accompanied Beasley into the residence, they smelled a strong odor of marijuana. Asked about the odor, the defendant took the officers into the kitchen, and showed them a tray containing a small amount of marijuana for personal use. However, the officers reported that they still smelled

"an overwhelming odor of raw marijuana coming from the living room area." After the arresting the defendant, law enforcement officers obtained a separate search warrant for the residence.

The defendant's motion to suppress acknowledges that "there is *perhaps* sufficient nexus to justify a search of the 'main living area' of the house for marijuana," but not for the entire house. (Dkt. 262, at 3 (emphasis by defendant)). The defendant cites no authority for such a narrow limitation on the area to be searched, other than general references to *Andresen v. Maryland*, 427 U.S. 463, 480 (1976), which noted the prohibition of general search warrants under the Fourth Amendment, and *United States v. Biglow* 562 F.3d 1272 (10th Cir. 2009).

*Biglow* notes the general requirement that an affidavit must demonstrate some nexus between the defendant's criminal activity and the place to be searched, but otherwise was provides no support for defendant's argument. To the contrary, the court in *Biglow* reversed the decision of the district court to suppress the results of a search executed pursuant to a warrant. The court held that the magistrate's decision to issue the warrant for the search of the defendant's home — his entire home, not simply one room in the house — had a substantial basis in fact.

The *Biglow* court held that the nexus requirement was satisfied by evidence showing the defendant's involvement in drug sales and the opinion of the special agent affiant that "drug dealers often keep evidence related to their illegal activities at their homes." 562 F.3d at 1283. The court stressed that "'in judging probable cause,' magistrates are 'not to be

confined' by miserly 'limitations or by restrictions on the use of their common sense.'" *Id.* (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969), *overruled on other gds*, *Gates*, 462 U.S. at 238)).

Here, the affidavit in support of the warrant establishes that officers smelled marijuana in the house, and asked defendant about it. He showed them to the kitchen, and showed them a tray containing a small amount of marijuana which he said was for his personal use. However, the officers also saw a cabinet containing numerous baggies with labels. Even after removing the marijuana in the tray, the affidavit states that the officers continued to smell a heavy marijuana odor from the living room. The officers also observed the defendant's girlfriend, before she was escorted off the premises, attempting to remove a bundle of United States currency.

The facts presented to the magistrate provided a substantial basis for his conclusion that drug trafficking was occurring the house, and that the house should be searched.

### Bill of Particulars

Defendant Gerald Wilson seeks a bill of particulars pursuant to Fed.R.Crim.P. 7(f). Wilson notes that he has been charged in Count 29 with maintaining a drug-involved premises in violation of 21 U.S.C. § 856(a)(1). He then notes the Tenth Circuit's decision in *United States v. Verners*, 53 F.3d 291, 296 (10th Cir. 1995), where the court held that the statute requires "a least in the residential context, that the manufacture (or distribution or use) must be at least one of the primary or principal uses to which the house is put." The

defendant then argues that "[t]he question to be satisfied ... breaks down to this:  Did *Mr. Wilson* manage or control the North Estelle Ave. residence ... and did *he* knowingly and intentionally use the residence or make it available for the purpose of unlawfully storing and distributing illegal drugs." (Dkt. 175, at 5 (defendant's emphasis)).

A bill of particulars serves to "inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense." *United States v. Levine*, 983 F.2d 165, 166–67 (10th Cir.1992) (citations and internal quotation marks omitted). *See United States v. Ivy*, 83 F.3d 1266, 1281 (10th Cir. 1996). The burden is on the defendant to demonstrate that, in the absence of a bill of particulars, he or she will not have any meaningful opportunity to prepare a defense, risks unfair surprise at trial, or faces a serious risk of double jeopardy. *See United States v. Diaz*, 2011 WL 6118610, *2 (D. Kan. Dec. 8, 2011). Whether to grant a bill of particulars under Rule 7(f) is committed to the discretion of the court. *Will v. United States*, 389 U.S. 90, 99 (1967).

The defendant's motion is denied. The Indictment describes the allegations against the defendants in detail, and recites in detail the criminal violations the government alleges. The defendant's motion in fact is not a true motion for bill of particulars. Given this level of detail, it is clear that Wilson has been "inform[ed] of the charge against him with sufficient precision to ... prepare his defense." Rather, the motion is an attempt to determine what evidence the government will produce to support Count 29.

A criminal defendant "is not entitled to notice of all of the evidence the government intends to produce, but only the theory of the government's case." *Levine*, 983 F.2d at 166-67

(citations and internal quotation marks omitted) (emphasis in the original). Thus, where the government complies with its discovery and disclosure obligations, a bill of particulars will be granted only rarely. *See United States v. Ard*, 2011 WL 686178, *3 (D. Kan. Feb. 18, 2011) (the court "has seldom granted discovery in a full disclosure case"). A request for a bill of particulars which "reads like a discovery request in which [defendant] seeks all the factual proof the government intends to offer at trial" will be denied, since "[a] bill of particulars is not the proper vehicle to obtain the government's evidence." *Diaz*, 2011 WL 6118610, at *2 (citing *United States v. Barbieri*, 614 F.2d 715, 719-20 (10th Cir. 1980).

### James Hearing

Defendants Gerald Wilson (Dkt. 176), Antoine Beasley (Dkt. 252, 254), Carlos Beasley (Dkt. 266), and Stephen Smallwood (Dkt. 277) have moved for a *James* hearing to determine whether co-conspirator hearsay statements may be introduced at trial. Defendant Gerald Wilson has moved for notice of any co-conspirator statements (Dkt. 241), to exclude testimonial statements by co-conspirators (Dkt. 243), and to exclude the guilty pleas of non-testifying co-defendants. (Dkt. 244). The government's response (Dkt. 349) agrees that a *James* hearing is necessary.

The court accordingly grants the motions of Smallwood and Antoine Beasley. Defendant's Wilson's motion for notice is denied, as the court Scheduling Order independently sets forth the government's discovery obligations, and the defendant has shown no grounds for departing from the requirements in that Order. Wilson's remaining

motions to exclude certain statements are premature given the state of the case, and the court will not render generic rulings in the absence of reference to any particular statement by a particular witness. Those motions are accordingly denied without prejudice.

### Additional Severance

The court has previously severed the trial of the charges against defendant Gerald Wilson pursuant to Fed.R..Crim.P. 14. Defendants Antoine Beasley, Carlos Beasley, Brandon Smith, Stephen Smallwood, and Helen Beasley have moved for severance also, arguing generally that the charges against them should be tried separately. (Dkt. 255, 265, 270, 282, and 289). In addition to this general argument, Antoine Beasley stresses that the EBT Program Fraud claim against him is only loosely connected to the larger conspiracy involved in the case. (Dkt. 373, at 2). Carlos Beasley argues that a joint trial will create the risk of "guilt by family association." (Dkt. 369, at 2). And Helen Beasley, citing *Zafiro v. United States*, 506 U.S. 534, 539 (1993), stresses that the danger of prejudice may be higher in complex cases involving defendants with "different degrees of culpability." (Dkt. 378, at 2).

The court hereby denies these motions, and finds that charges involving the remaining defendants should be resolved by one trial.

When deciding whether to sever defendants under Rule 14, the court "must weigh the prejudice to a particular defendant caused by the joinder against the important considerations of economy and expedition in judicial interests." *United States v. Mabry*, 809

F.2d 671, 681 (10th Cir. 1988), overruled on other grounds, *Mathews v. United States*, 485 U.S. 58 (1988). Prejudice in this context means "there is a serious risk that a joint trial [will] compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534 (1993).

In *Zafiro*, the Supreme Court recognized the "preference in the federal system for joint trials of defendants who are indicted together." 506 U.S. at 539.

> Joint trials "play a vital role in the criminal justice system." *Richardson v. Marsh*, 481 U.S. 200, 209, 107 S.Ct. 1702, 1708, 95 L.Ed.2d 176 (1987). They promote efficiency and "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Id.*, at 210, 107 S.Ct., at 1708. For these reasons, we repeatedly have approved of joint trials. *See ibid.; Opper v. United States*, 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954); *United States v. Marchant*, 12 Wheat. 480, 6 L.Ed. 700 (1827); *cf.* 1 C. Wright, Federal Practice and Procedure § 223 (2d ed. 1982) (citing lower court opinions to the same effect).

*Id.* at 537-38

The preference is reflected as well in decisions by the Tenth Circuit. *See United States v. Peveto*, 881 F.2d 844, 857, n. 16 (10th Cir. 1989) ("[c]ourts generally adhere to the principle that 'those indicted together, especially co-conspirators, should be tried together,'" (*quoting* 8 J. Moore, W. Taggert & J. Wicker, Moore's Federal Practice ¶ 14.05, p. 14-82 [2 ed. 1989])); *United States v. Jenkins*, 904 F.2d 549, 556-557 (10th Cir. 1990) (persons jointly indicted should be tried together).

"Inasmuch as severance is a matter of discretion and not of right, the defendant must bear a heavy burden of showing real prejudice to his case." *United States v. McConnell*, 749 F.2d 1441, 1444 (10th Cir.1984). As the Supreme Court stated in *Zafiro*, "when defendants

properly have been joined under Rule 8(b), a district court should grant a severance under

Rule 14 *only* if there is a serious risk that a joint trial would compromise a specific trial right

of one of the defendants, or prevent the jury from making a reliable judgment about guilt

or innocence." 506 U.S. at 539 (emphasis added).

> To establish "real prejudice, the defendant must demonstrate that the alleged prejudice he suffered outweighed the expense and inconvenience of separate trials." *United States v. Martin*, 18 F.3d 1515, 1518 (10th Cir.1994) (quotations omitted). The requisite showing of prejudice "is not made by a complaint that one defendant is less culpable than another, or by an allegation that a defendant would have a better chance of acquittal in a separate trial, or by a complaint of the 'spill-over' effect of damaging evidence presented against a codefendant." *United States v. Iiland*, 254 F.3d 1264, 1270 (10th Cir.2001) (citations omitted). "Rather, a defendant must show that he was deprived of his right to a fair trial." *United States v. Zapata*, 546 F.3d 1179, 1191 (10th Cir.2008).

*United States v. Morgan*, 748 F.3d 1024, 1043 (10th Cir. 2014).

The defendants in the present action have not met this heavy burden. Generally,

"neither a mere allegation that defendant would have a better chance of acquittal in a

separate trial, nor a complaint of the 'spillover effect' [of damaging evidence] is sufficient

to warrant severance." *United States v. Levine*, 983 F.2d 165, 167 (10th Cir. 1992). Similarly,

the fact that the evidence may be more incriminating against one defendant than another

is not, standing alone, a basis for severance. *United States v. Dill*, 693 F.2d 1012 (10th Cir.

1982). A defendant is not entitled to severance simply because some evidence implicates

only a co-defendant. *See Morgan*, 748 F.3d at 1043 (no prejudice because the defendant "had

the opportunity to point this out to the jury through cross-examination and again during

closing argument," and the court 's instructions directed the jury "to examine the evidence

for each individual defendant, and juries are presumed to follow instructions").

The court finds that the defendants' generic claims of spillover prejudice do not warrant severance. The allegations in the present case include multiple, overlapping conspiracies, but are unified by a general common purpose of maintaining and facilitating an ongoing drug trafficking operation. To the extent that some defendants are only charged in one aspect of the larger criminal enterprises, the approach recognized in cases such as *Morgan* is appropriate here as well — the defendants may freely cross examine the government's witnesses, and the court will carefully instruct the jury to consider the charges and the evidence relating to each defendant separately. Similarly, defendant Antoine Beasley's contention that the EBT Program Fraud charges against him are not related to the larger conspiracy in the case is a factual argument which is properly presented to the jury. The government represents that its evidence will show that as part of the larger conspiracy, defendants traded EBT cards for controlled substances, as a means of laundering the profits for drug trafficking.

Complexity by itself does not automatically warrant severance. Moreover, while the present case involves multiple counts and multiple defendants, at the end of the day the case is no more complex than other multi-defendant cases that have been addressed by this court through a single trial.

*Daubert Motion*

The discovery materials provided to Antoine Beasely include evidence showing his

40

fingerprints on an Express Mail package, apparently containing contraband substances. The defendant has moved for a *Daubert* hearing, seeking to challenge the scientific reliability of fingerprint evidence. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588 (1993).

The court denies the request for a *Daubert* hearing. The defendant supplies no case authority supporting such a foundational threshhold for fingerprint evidence.[3] The government proffers that it will establish the qualifications of its expert fingerprint witness at trial. The government's expert will also show the scientific reliability of fingerprint evidence. The Tenth Circuit has observed that "[f]ingerprint identification has been used extensively by law enforcement agencies all over the world for almost a century." *United States v. Baines*, 573 F.3d 979, 990 (10th Cir. 2009)." As a result of fingerprint technology, "reliable identifications may be made from comparison of latent prints with known prints." *Id.* The court further observed that fingerprint identification has an "impressively low" error rate, and has achieved "overwhelming acceptance" by experts in the field. *Id.* at 991.

In *United States v. Avitia-Guillen*, 680 F.3d 1253, 1260 (10th Cir. 2012), the court cited *Baines*, observing: "Fingerprint comparison is a well-establish method of identifying persons, and one we have upheld against a *Daubert* challenge." The *Avitia-Guillen* court also denied the defendant's *Daubert* challenge, observing that "Defendant has pointed to nothing in the record indicating Bacchi deviated from normal, reliable fingerprint comparison methods." *Id.*

---

[3] The only authority cited at all by defendant (Dkt. 304, at 4) is a passing observation from a dissenting opinion. *United States v. Crisp*, 324 F.3d 261, 273 (4th Cir. 2003) (Michael, J. Dissenting).

The court denies the defendant's request for a separate, pre-trial Daubert hearing on the subject of fingerprint science.

### Presentation of the Indictment to the Jury

Antoine Beasley and Stephan Smallwood have moved to exclude as "surplusage" what they contend is argument contained in the Indictment. (Dkt. 256, 283). They also move to exclude the Indictment entirely from the jury room during deliberations. (Dkt. 257, 281). The court hereby denies these motions.

The defendants argue that the Indictment is contrary to Fed.R.Crim P. 7(c)(1), which contemplates a "plan, concise, and definite statement of the essential facts." They further note that under Rule 7(d), the court may strike portions of an indictment which are irrelevant or prejudicial. *See United States v. Zabawa*, 39 F.3d 279, 285 (10th Cir. 1994).

The Indictment in the present case is not short, but it does not violate Rule 7. The present case, after all, alleges multiple, overlapping conspiracies. Read in this context, the Indictment is not gratuitously long, but presents a fair summary of the alleged facts underlying the government's case. A careful review of the Indictment fails to reveal any irrelevant or unfairly inflammatory allegations.

A court will strike language from an indictment under Rule 7(d) only if it is clear that the allegations are inflammatory and prejudicial. *United States v. Ailsworth*, 873 F.Supp. 1450, 1457 (D. Kan. 1994) (*quoting* 1 C. Wright, Fed. Prac. & Proc. 127 (1982)). *United States v. Collins*, 920 F.2d 619, 631 (10th Cir. 1990). The court finds that the factual allegations in the

Indictment will help the jury to understand the nature of the government's allegations.

> "It is common practice to read the indictment to the jury." *United States v. Scott*, 37 F.3d 1564, 1576 (10th Cir. 1994). Having read the indictment to the jury, the subsequent submission of a copy of an indictment to the jury for its deliberations is not unusual. *See, e.g., United States v. Aguilar*, 242 Fed.Appx. 239 (5th Cir. 2007); *United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998). Such a practice is committed to the discretion of the court. *United States v. Skolek*, 474 F.2d 582, 586 (10th Cir. 1973); *Wall v. United States*, 384 F.2d 758 (10th Cir. 1967). The defendant has failed to show any rationale for departing from this standard practice.

*United States v. Enns*, No. 15-10045-JTM, 2015 WL 877006, *1 (D. Kan. Dec. 14, 2015) (Dkt. 88, at 3).

The court's standard practice in criminal trials is to read the Indictment to the jury, and to submit a copy of the Indictment to the jury during deliberations — coupled with careful instructions that the Indictment is merely an allegation by the government, and by itself is proof of nothing. The defendants in the present action have shown no justification for departing from this standard practice.

To the extent that certain portions of the Indictment may be found to be unsupported at trial, the court will follow its standard practice and redact such portions before the Indictment is read to the jury.

### Motion in Limine

Defendant Carlos Beasley has submitted a motion for miscellaneous relief, which asks that witnesses be "instructed to use the full names of anyone they are testifying about," that the court should exclude inadmissible "opinion testimony, speculative testimony, ...

hearsay ... [or evidence of] prior bad acts." (Dkt. 268, at 1). Further, the court should preclude any reference to the defendant's exercise of his *Miranda* rights. (Id. at 2).

The court will deny the motion, as it fails to identify any specific identifiable evidence which defendant reasonably contemplates the government is likely to introduce at trial. The government's response affirmatively represents that all its evidence will comply with the Federal Rules of Evidence.

In *Enns*, this court recently rejected a similar generic motion in limine seeking to require that the government abide by the Federal Rules of Evidence.

> A motion in limine is designed to prevent the interjection of specific evidence that is irrelevant, inadmissible, or prejudicial." *Hemetek v. United States*, 2012 WL 3870620, *9 (S.D.W.Va. 2012). Thus, such a motion "seeking to prohibit generic, unspecified 'prejudicial' testimony [is] not useful." *Id.* A motion in limine which "generally lacks specificity as to any particular evidence" is properly denied. *See United States v. DesFosses*, 2011 WL 4104702, *8 (D. Idaho 2011).

2015 WL 8770006, *1.

To the extent any witness's testimony is unclear, such ambiguity is best addressed by a contemporaneous correction by the court during trial.


***Motion in Limine***

Defendant Gerald Wilson has moved to exclude reference to the alleged battery of Nicole Vann. (Dkt. 242). The government responds that it has no intention of presenting evidence of the battery in its case-in-chief. (Dkt. 357). Rather, limited reference will be made to a disturbance in front of the residence, as a means of understanding the reasons police

officers were on the scene at the time in question. The defendant has filed no reply or objection to the government's position, and the court grants the motion such that the government shall not reference the alleged battery other than for the limited purpose set forth in its Response.

### *Motion to Identify Confidential Witnesses*

Defendant Gerald Wilson has moved for the identification of all confidential informants, citing *Roviaro v. United States*, 353 U.S. 53 (1957), as well as the "un-redacted statements by any and all eyewitnesses to the crimes charged in the Indictment that involve Mr. Wilson." (Dkt. 240, at 5).

In *Rovario*, the Supreme Court recognized the government's privilege to "withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." 353 U.S. at 59. Defendant Wilson correctly points out that under *Rovario*, this privilege is not unlimited, and the court may be obliged to balance the public's interest in protecting the flow of information against an accused's right to prepare his or her defense. *Id.* at 62.

However, disclosure under *Rovario* is not automatically granted upon a defendant's motion. The defendant has the burden of showing that an informant's testimony is relevant or essential to a fair trial. *United States v. Sinclair*, 109 F.3d 1527, 1538 (10th Cir.1997); *United States v. Gordon*, 173 F.3d 761, 7867 (10th Cir. 1999).

As a general rule, the Tenth Circuit requires disclosure when the informant's

testimony "might be relevant to the defendant's case and justice would best be served by disclosure." *United States v.. Reardon*, 787 F.2d 512, 517 (10th Cir.1986). In practice, the Tenth Circuit has not required disclosure "where the information sought 'would be merely cumulative,' or where the informer did not participate in the illegal transaction," [*United States v.*] *Mendoza-Salgado*, 964 F .2d 993, 1001 (10th Cir.1992) (quoting *United States v. Scafe*, 822 F.2d 928, 933 (10th Cir.1987)) (other citations omitted), where the informant is not a participant or witness to the crime, *United States v. Brantley*, 986 F.2d 379, 383 (10th Cir.1993), or where the informant is a mere tipster, *United States v. Wynne*, 993 F.2d 760, 766 (10th Cir.1993). Accordingly, defendants face "a heavy burden ... to establish that the identity of an informant is necessary to [the] defense." Mere speculation about the usefulness of an informant's testimony is not sufficient to warrant disclosure. *Mendoza Salgado*, 964 F.2d at 1001.

*United States v. Wright,* 2001 WL 523394, *21 (D. Kan. 2001).

In the present action, defendant fails to meet this burden. Defendant's original motion recites the general background and rules of law relating to informants (Dkt. 240, at 1-5), but fails to explain at all how the facts of the case satisfy his burden under the cases cited above. Instead, Wilson offers only the bare conclusion that in this case "the informant has played a crucial role in the alleged criminal transactions(s), and disclosure and production of the informant are required to ensure a fair trial." (*Id*. at 5).

Wilson's Reply simply reiterates the rules of law relating to the production of informant testimony (Dkt. 357, at 2-4), and does nothing at all by way of supporting or even acknowledging the burden of showing the necessity for the production of the informant's identity. In particular, the defendant makes no specific rejoinder to the government's entirely correct observation in its Response that speculation is an insufficient basis for production of an informant's identity, that the motion does not "elaborate on how a specific

46

informant's testimony will meaningfully aid [his] defense," nor does it explain how the informant's testimony "would not be cumulative to the testimony of the other witnesses who have been identified for the defense through the disclosure of numerous police reports."

With respect to the pretrial statements of witnesses, the court in the last Scheduling Order (Dkt. 120, at 3) has already set forth the requirements for the necessary disclosures, which incorporate the requirements of 18 U.S.C. § 3500 and Rule 26.2, and these requirements remain in effect.

### Rule 404(b) Evidence

Four defendants have moved for notice of any Rule 404(b) evidence the government intends to introduce. (Dkt. 245, 253, 276, 278). The government has responded by stressing the large amount of discovery provided to the defendants. (Dkt. 350). The evidence in this discovery, the government states, is relevant to "the substantive crimes charged in the indictments," as well as proving "the overall conspiracy, overt acts, specified unlawful activity, drug quantities, co-conspirator relationships and/or the criminal intent" of the defendants. (*Id*. at 2). The government states that "if defense counsel has reviewed the discovery provided, in a timely manner, they know the evidence of other conduct, crimes or wrongs that will be presented as substantive evidence proving the crimes and forfeiture allegations charged." (*Id*. at 3).

Defendants Smallwood, Antoine Beasley, and Gerald Beasley have filed no reply to

the government. Defendant Gerald Wilson has reiterated (Dkt. 359) his contention that a generic reference to discovery does not satisfy the government's obligation to supply reasonable notice of its intent to rely on Rule 404(b) evidence, citing decisions such as *United States v. Birch*, 39 F.3d 1089 (10th Cir. 1994) and *United States v. Long*, 814 F. Supp. 72, 74 (D. Kan. 1993).

Rule 404(b) provides:

(1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) Permitted Uses; Notice in a Criminal Case. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must:

(A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and

(B) do so before trial--or during trial if the court, for good cause, excuses lack of pretrial notice.

Under Rule 404(b), the government should "articulate with precision" the valid basis for other crimes or wrongs evidence. 39 F.3d at 1093. "[A] broad statement merely invoking or restating Rule 404(b) will not suffice." *Id.* (quoting *United States v. Kendall*, 766 F.2d 1426, 1436 (10th Cir. 1985)).

Thus, the court finds that the generic response of the government does not presently satisfy the requirement of Rule 404(b) that the government articulate with precision the nature and rationale for evidence falling within the scope of the rule.

48

The Advisory Committee Notes to Rule 404(b) observe that "[o]ther than requiring pretrial notice, no specific time limits are stated in recognition that what constitutes a reasonable request or disclosure will depend largely on the circumstances of each case." Senate Report No. 93–1277. The purpose of the requirement for pretrial notice is "to reduce surprise and promote early resolution on the issue of admissibility." *Id. See United States v. Hernandez*, 1999 WL 318090, \*3 (D. Kan. 1999) (citing cases generally indicating ten to fourteen days notice was sufficient).

In the present action, the Scheduling Order provides:

> Pursuant to Rule 404(b), the government shall provide to the defendant the general nature of other crimes, wrongs or acts of the defendant which the government intends to use at trial. The government shall provide this information at least 30 days prior to trial. No later than 14 days prior to trial, the defendant shall file any motion objecting to the use of such evidence. The motion shall state whether the defendant requests an evidentiary hearing.

(Dkt. 120, at 3). Although the Scheduling Order has been superseded as to the date of the defendant's trial, it remains in effect otherwise, and reflects a measured and appropriate standard for the present case.

IT IS ACCORDINGLY ORDERED this 8th day of February, 2016, that the court hereby denies Gerald Wilson's Motion for a Bill of Particulars (Dkt. 175); denies Wilson's Motion for Identification (Dkt. 240); denies defendant Antoine Beasley's Motion for a Daubert Hearing (Dkt. 304); denies Carlos Beasley's Motion in Limine (Dkt. 268); denies the defendants' Motions for Severance (Dkt. 255, 265, 270, 282, 289); denies defendants' Motions

to Limit Use of the Indictment at Trial (Dkt. 256, 257, 281, 283), and denies without prejudice Gerald Wilson's objections to potential evidence (Dkt. 241, 243, 244).

The court grants Gerald Wilson's Motion in Limine (Dkt. 242); grants defendants' Motions for a *James* Hearing (Dkt. 176, 252, 254, 266, 277); and grants defendants' Motions for Notice of Rule 404(b) Evidence (Dkt. 245, 253, 276, 278), and directs that a concise summary of proposed Rule 404(b) evidence and its purpose shall be presented to the defendants at a time consistent with the Scheduling Order.

The court denies the defendants' Motions to Suppress. (Dkt. 247, 248, 249, 251, 258, 260, 261, 263, 267, 275, 284, 285).

                                           _____s/ J. Thomas Marten_____
                                          J. THOMAS MARTEN, JUDGE