IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

                    Plaintiff,

                vs.                          Case No. 13-10112-01-12-JTM

GERALD BEASLEY, *et al.*,

                    Defendants.

MEMORANDUM AND ORDER

By a separate Order (Dkt. 390), the court addressed numerous motions advanced by the defendants in this prosecution for conspiracy, drug trafficking, and money laundering. The present Order addresses the remaining suppression motions advanced by three of the defendants.[1]

Antoine Beasley has moved (Dkt. 259) to suppress the results of the search of a USPS package that was conducted pursuant to a warrant. Gerald Beasley has moved (Dkt. 274)

---

[1] Defendants Gerald and Antoine Beasley have moved to join in Terry Beasley's motion to suppress evidence from his traffic stop. (Dkt. 286, 287). William Parker has moved to join Gerald Beasley's motion to suppress. (Dkt. 317). The court granted the motions to join. For ease of reference, the present Order refers to the suppression motions only by the party filing the original substantive motion.

to suppress evidence gained following the June 12, 2013 stop of his Lincoln Navigator. This stop and search was conducted pursuant to a warrant, and was part of a series of warrants executed that day, culminating from the government's investigation of an alleged drug and money laundering conspiracy among Beasley family members. Terry Beasley has moved (Dkt. 250) to suppress evidence obtained from his vehicle a few days earlier, after officers conducting surveillance concluded that he was attempting to remove evidence of criminal activity from a Wichita storage facility.

*Antoine Beasley's Motion to Suppress*

On February 13, 2013, United States Postal Inspector Justin Lewis was working at the Postal Processing and Distribution Center in Wichita, Kansas, when he noticed an Express Mail package. The package had been mailed for overnight delivery from Aurora, Colorado, an area known for the production of marijuana. The package had a hand written label , and was heavily taped at the seams. Lewis also determined that the recipient of the package, Mich McNeal, 655 N. Estelle in Wichita, was not a person associated with the receiving address.

The package also indicated that the sender, Tracey Williams, resided at an address in Denver, Colorado. The sender had waived signature upon delivery. Inspector Lewis contacted the resident of the Denver address, who stated he had no knowledge of a Tracey Williams. The resident also stated he had not sent any package to Wichita, and had not given anyone permission to use his Denver address.

2

Lewis then contacted Wichita Police Detective Bryan Martin, who had his drug dog Kilo sniff the outside of the package. The dog alerted, and law enforcement officers obtained a search warrant for the package.

The Supreme Court has held that sealed packages in the mail are "free from inspection by postal authorities, except in a manner provided by the Fourth Amendment." *United States v. Leeuwen*, 397 U.S. 249, 250, 90 S.Ct. 1029, 25 L.Ed.2d 282 (1970) (involving the detention of a postal package based on reasonable suspicion). This court has held that postal inspectors may detain a package to conduct an investigation if they have a reasonable and articulable suspicion that it contains contraband or evidence of illegal activity. *United States v. Hill*, 701 F.Supp. 1522, 1527-28 (D. Kan. 1988).

In the present motion, defendant Antoine Beasley notes that many packages are heavily taped, and are sent with similar handwritten labels. In addition, he argues, the source of a particular package is "is irrelevant," citing the decision of the Tenth Circuit in *United States v. Williams*, 271 F.3d 1262, 1270 (10th Cir. 2001).

The court finds that Inspector Lewis had a reasonable suspicion to temporarily hold the package. The court notes that *Williams* involved a traffic stop, and the associated detention of the defendant's person. The present case, of course, involves the temporary detention of a mailed package which was not in Antoine Beasley's possession, and was not even addressed to him. The temporary detention thus reflects a far less intrusive effect on the defendant's privacy interests. Second, the *Williams* court did not indicate that the source of a package (or vehicle) is irrelevant. It simply held that such information *by itself* cannot

3

justify a traffic stop. *See Williams*, 271 F.3d at 1270 ("Standing alone, a vehicle that hails from a purported known drug source area is, at best, a weak factor in finding suspicion in criminal activity").

In reviewing the seizure of the Express Mail package, the court does not look at each facet of the evidence in isolation. Rather, the court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). In evaluating the totality of the circumstances, the court may not consider each factor in isolation. *See id.* at 274 (rejecting evaluation of the listed factors in isolation from each other as a type of "divide-and-conquer analysis"). Reasonable suspicion may exist even if each factor, standing alone, is susceptible to an innocent explanation. *United States v. Hernandez*, 313 F.3d 1206, 1210 (9th Cir.2002). "A combination of seemingly independent innocent factors may create a reasonable suspicion justifying detention for a dog sniff if the factors substantially reflect elements of a suspicious profile. " *United States v. Scarborough*, 128 F.3d 1373 (10th Cir.1997).

Courts presented with similar facts have routinely held that reasonable suspicion existed as to a mailed package. *See, e.g.,  United States v. Ramirez*, 342 F.3d 1210, 1211-12 (10th Cir. 2003) (reasonable suspicion existed to detain Express Mail packages with handwritten labels sent to Wyoming from Montebello, California, "a known source area for methamphetamine distribution to Wyoming," which included a  "non-existent return address"); *United States v. Huerta*, 655 F.3d 806 (8th Cir.2011) (Express Mail package with

handwritten label from drug source state, name of sender unrelated to return address, telephone number listed for sender disconnected day after package was mailed, number in return address was scratched out, mailing zip code different than zip code on return address, destination address a hotel, and heavily taped); *United States v. Duncan*, 2015 WL 10373174, *5 (W.D. Mo. 2016) (Express Mail package with signature waiver, "careful taping of all the seams," and fictitious return address);[2] *United States v. Hill*, 701 F.Supp. 1522, 1528-29 (D. Kan. 1988) (package sent from Los Angeles, "a source city for drugs" to Kansas City, "a known recipient city," handwritten label, and, "of special import," a false return addressee).

Standing alone, the fact that the Express Mail package in the present case was sent from Colorado might not support a temporary detention of the package. The same is true if the court were to look only at the fact the package was heavily taped. But, of course, the court must look to the evidence as a whole. When all of these factors are combined the handwritten labels, the overnight delivery, and most importantly, the apparently false names used for sender and recipient, Inspector Lewis had reasonable suspicion for delaying the package in order to arrange for a K-9 sniff.

The court further finds that the evidence presented by affidavit in support of the

---

[2] In *Duncan*, as here, the subsequent canine sniff of the Express Mail package was positive for the presence of narcotics. However, the court did not rest its finding of probable cause on the canine sniff alone. It held that the facts observed by the postal inspector not only created reasonable suspicion, but independent probable cause for the Magistrate Judge's decision to issue the warrant. *See* 2015 WL 10373174 at *5 ("absent the dog sniff there was still sufficient evidence to establish probable cause. The dog sniff merely furthered the conclusion that probable cause existed").

warrant establishes the general reliability of the dog sniff in the present case. *See Florida v. Harris*, ___ U.S. ___, 133 S.Ct. 1050 (2013). Detective Martin had been employed by the Wichita Police Department for nearly 22 years. Currently assigned to the Special Investigations Bureau, Undercover Narcotics Section, he has attended several schools dealing with the investigation and detection of narcotics presented by the Kansas Bureau of Investigations, Drug Enforcement Administration and the Wichita Police Department. He has been trained in the recognition, cultivation, processing, packaging, sale and distribution of narcotics including concealment techniques of controlled substances. In November of 2000, Detective Martin attended the Advanced Criminal Interdiction School (Operation Pipeline) which discussed concealment techniques and characteristics and indicators of narcotics traffickers. In February of 2000, Detective Martin attended Operation Jetway which discussed narcotic trafficking through utilization of bus, train, aircraft and postal service. Kilo is Detective Martin's third K-9.[3] Kilo was purchased through Hill Country Canine in San Antonio, Texas. Detective Martin completed a 10-week training course with Kilo, who is currently certified in narcotic detection and handler protection.

---

[3] Detective Martin worked with K-9 Schwatzie from May of 2000 to May of 2003. Schwatzie was purchased through K-9 Unlimited based out of Tulsa, Oklahoma. Schwatzie met the certification standards of both the Kansas Police Dog Association (KPDA) and the North American Police Work Dog Association (NAPWDA), and was trained in the detection of methamphetamine, cocaine, crack cocaine, heroin and marijuana. Martin began working with a second K-9, Rex, in May of 2003. Rex was purchased from Elliot's Police K-9 located in Hutchinson, Kansas. Martin completed 90 hours of training with K-9 Rex in the area of narcotics detection. Rex was trained to locate and indicate the presence of the following narcotics odors: marijuana, methamphetamine, cocaine, crack cocaine and heroin, and was certified by the Kansas Highway Patrol and the Kansas Police Dog Association.

K-9 Kilo is trained to locate and indicate to the following narcotic odors: marijuana, methamphetamine, cocaine, crack cocaine and heroin. K-9 Kilo is currently certified through the Kansas Highway Patrol.

The court finds that the warrant issued by the Magistrate Judge was properly issued on probable cause, as reflected in the information obtained by Detective Martin and Inspector Lewis.

### *Gerald Beasley's Motion to Suppress*

Law enforcement officers executed numerous search warrants across the City of Wichita on June 12, 2013, seeking evidence relating to the drug trafficking and money laundering charges set forth in the Superseding Indictment. As a part of this sweep, between 8:45 and 8:50 a.m., Officer Robert G. Bachman stopped a Lincoln Navigator driven by Gerald Beasley. As a result of their prior investigations, law enforcement officers had a search warrant for the Navigator. They did not have an arrest warrant for Beasley.

Beasley lived in Officer Bachman's patrol area at 1122 N. Piatt, and, according to the defendant's motion, Officer Bachman has indicated that Beasley was respectful and cooperative in their prior meetings.

ATF agents waited for Beasley to leave the residence. When he did, they notified Officer Bachman to stop him at another location, as they prepared to search the residence.

Bachman stopped the Navigator a few blocks away, and approached the side of the vehicle. Officer Bachman testified credibly at the hearing that he did not touch or restrain

the defendant in any way. Bachman asked Beasley to step out of the vehicle, and if he had any weapons. Beasley said that he did, a .22 caliber pistol in his front pocket. Beasley said he had a permit for the firearm.

Bachman patted Beasley down. He found the pistol, which he removed, as well as a knife.

Bachman knew that Beasley had a prior felony conviction. He also knew of a prior incident in which Beasley was reported to have stabbed another person with a screwdriver, but the victim decided not to prosecute .

Bachman did not tell Beasley he was under arrest. He never handcuffed him or issued Miranda warnings. When Beasley asked what was this all about, Bachman said that other officers would be there soon. When Beasley asked again, Bachman told him he was not free to leave. Bachman later asked Beasley if he had a permit for the firearm, and Beasley said he did not.

Federal agents arrived, and obtained a key from Beasley to conduct the search of the residence. Officers also drove Beasley to his restaurant at 1339 N. Hillside, and he unlocked the door so that the restaurant could also be searched pursuant to a warrant. Beasley sat in the restaurant during the search. The agents at the scene initially decided not to arrest Beasley, and told him he was free to go. However, after an ATF agent contacted his supervisor and an Assistant United States Attorney, the officers decided to arrest the defendant.

Beasley remained with Bachman throughout the day. At some point, law

enforcement authorities informed Officer Bachman that Beasley would be booked for possession of the firearm after a felony conviction. Beasley made several comments to Bachman before he was booked at the Adult Detention Facility. At the time of booking, Beasley asked Bachman what the time frame was for him to legally possess a firearm. Bachman explained that he did not know the answer, if the earlier offense involved a federal conviction. Beasley said his last federal conviction was in the late 1990s. He also said, "I should have thrown that gun out the window before you caught up to me." As a result of the search of Gerald Beasley, the government seized various items, including credit cards, ID's, a different person's Vision cards, a pocket knife, and the .22 caliber Derringer.

The defendant agrees that Bachman "had reason to pull over" the Navigator, but argues that he was in custody from that moment forward, and should have been given his Miranda rights. (Dkt. 377, at 5-6). He argues that there was no basis for asking whether he was armed, since the officer "was familiar with Gerald Beasley and did not express any concern for his own safety until *after* he had asked Gerald Beasley if he had any weapons and then received an affirmative response." (Dkt. 274, at 6 (emphasis in original)).

As defendant concedes, Bachman was entitled to stop the Navigator. Bachman was entitled to conduct the traffic stop according to the ordinary rules of a *Terry v. Ohio* temporary detention. *United States v. Holt*, 264 F.3d 1215, 1230 (10th Cir. 2001). At such a *Terry* stop, or even if the defendant was fully detained, Bachman was entitled under the public safety exception recognized *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81

L.Ed.2d 550 (1984) to inquire as the presence of firearms.

The Tenth Circuit discussed the application of *Quarles* in *United States v. DeJear*, 552

F.3d 1196, 1201-02 (10th Cir. 2009).

> This circuit has applied the *Quarles* public safety exception to allow an officer
> to ask a suspect, "Do you have any guns or sharp objects on you," without
> first giving the Miranda warnings. *United States v. Lackey*, 334 F.3d 1224, 1225
> (10th Cir.2003). We reasoned that the question "addressed a real and
> substantial risk to the safety of the officers and Defendant: If Defendant was
> carrying such an item, he could use it against the officers or, perhaps more
> likely, someone could be seriously injured when Defendant, who was
> already under arrest, was routinely searched or frisked." *Id.* at 1227
> (emphasis deleted); *cf. United States v. Holt*, 264 F.3d 1215, 1226 (10th
> Cir.2001) (*en banc*) (holding that, during a routine traffic stop, an officer may
> ask whether loaded weapons are present "[g]iven the dangers inherent in all
> traffic stops"). However, we have not yet adopted a generally applicable
> standard for determining whether a sufficient threat to officer safety exists
> under *Quarles*.
>
> In contrast, the Sixth Circuit has announced such a standard. Under
> Quarles's public safety exception, "[f]or an officer to have a reasonable belief
> that he is in danger, at minimum, he must have a reason to believe (1) that
> the defendant might have (or recently have had) a weapon, and (2) that
> someone other than police might gain access to that weapon and inflict harm
> with it." *United States v. Williams*, 483 F.3d 425, 428 (6th Cir.2007). We agree
> with the Sixth Circuit's formulation and apply it here.

552 F.3d at 1201-02. As this passage indicates, a public safety inquiry may be advanced not

only in *Terry* stops, but in cases in which a defendant "was already under arrest."

Gerald Beasley argues in his Reply (Dkt. 377, at 4) that *DeJear* is inapplicable because

"[i]t was not until after he asked Mr. Beasley if he had a weapon that Officer Bachman

voiced any concern for his own safety."

But this mistakes the burden under *DeJear*, which is not high. The ability to inquire

about the presence of firearms arises if an officer reasonably believes a defendant "*might have*" a gun which someone "*might* gain access to." 552 F.3d at 1202 (emphasis added). Thus, the law only requires that an officer have a reason to believe that it is *possible* there is a gun at the scene. *See United States v. Legg*, 18 F.3d 240, 244 (4th Cir. 1994) (recognizing as "a hallmark of Fourth Amendment jurisprudence that the possibility of a threat to the safety of law enforcement officers may constitute exigent circumstances justifying a warrantless search "). As the Tenth Circuit itself notes in the quoted passage from *DeJear*, it previously upheld the right of police to inquire about weapons in *Holt*, which *DeJear* accurately describes as "a route traffic stop."

Alternatively, the defendant argues (*id*. at 5) that Officer Bachman, knowing that Beasley had a felony conviction, should have known that any affirmative response to a question about the existence of weapons would have been incriminating, and thus Bachman was obliged to issue a Miranda warning before asking about the existence of any firearms. The defendant supplies no authority for holding that police must delay public safety inquiries, in the case of known felon, until after issuing Miranda warnings. Courts have held that public safety inquiries may be made before Miranda warnings. *See United States v. Wilkins-01*, 2014 WL 3099751, *8 (N.D. Ga. July 7, 2014) ("Even if Miranda were otherwise to apply, the Supreme Court has also indicated [in *Quarles*] that, under a public safety exception, officers may pose limited, pre-warning questions related to the safety of themselves or the public").; *United States v. Newsome*, 475 F.3d 1221 (11th Cir.2007) (officer permissibly asked arrested defendant, before Miranda warnings, "is there anything or

11

anyone in the room I should know about," after which defendant disclosed the location of a gun).

In *United States v. Hickman*, 2013 WL 672580, *4 (M.D. Fla. Jan. 24, 2013), the court directly rejected a similar argument, finding that "[t]he question to Defendant about any firearms or weapons was permissible under the public safety exception even though the agent knew that Defendant was a convicted felon." The defendant in *Hickman* claimed that the question about the presence of firearms was a subterfuge, seeking incriminating statements that could be used to charge him with being a felon in possession. The court concluded

> accepting Defendant's position would ignore the objectively reasonable facts known to Agent Tyska and run afoul of the rule announced in *Quarles* that the public safety exception does not depend on the subjective intentions of the officers questioning the defendant. *See Quarles*, 467 U.S. at 655–56. Defendant's pre-Miranda statement regarding the firearm is admissible.

*Id.*

Bachman's inquiry as to the presence of weapons was permissible under *Quarles* and *Lackey*. Within seconds of stopping the Navigator, Office Bachman had probable cause for arresting Beasley as a felon in possession of a firearm. Beasley's subsequent comments, as he was being booked, were initiated by himself rather than the consequence of any questioning or interrogation, and so are not subject to suppression.

### Terry Beasley's Motion to Suppress

On June 3, 2013, law enforcement officers stopped a vehicle driven by Terry Beasley.

At the time of the stop, the vehicle was under surveillance by law enforcement officers. Pursuant to wiretap warrants addressed in the court's earlier Order, officers had learned that Terry Beasley planned to meet with co-defendants Helen Beasley (Gerald Beasley's wife) and Antoine Beasley (Gerald Beasley's son) at a storage facility, located at 1175 S. Rock Road, where they would remove certain property, which was likely contraband or evidence of drug trafficking. Officers observed the meeting, and later followed Terry Beasley.

ATF Special Agent Larry Stoddard was one of the officers conducting surveillance of the storage facility meeting. He followed Terry Beasley when he left the facility, driving east on Harry Street.  Approximately two miles later, in the area of 11200 E. Harry Stoddard observed Terry Beasley's vehicle cross over the solid yellow center lane. Stoddard and other surveillance officers were in contact with supervisors in the wiretap intercept room.

Stoddard reported his observation, and agents made the decision to stop Beasley's vehicle on the putative grounds of the traffic infraction. The agents wished to use the traffic infraction as the basis for a "wall off" stop, meaning they would explain the stop on the grounds of the infraction, so that Beasley would not suspect the existence of the wiretaps.[4] The agents also hoped to obtain additional grounds for searching the vehicle, although they

---

[4] *See United States v. Noble*, 762 F.3d 509, 515 n. 2 (6th Cir. 2014) ("During an undercover investigation, if it is necessary to stop a suspect's vehicle, law enforcement will sometimes request that a marked patrol car initiate a traffic stop based on a traffic infraction in order to avoid disclosing the larger investigation's existence").

believed that they had already probable cause for such a search on the basis of the wiretaps.

Dispatchers directed Officers Michael Russell and Chad Clark, operating a marked police vehicle, to conduct the stop. Russell and Clark stopped the vehicle at 1500 S. Brookhaven at about 7:00 p.m., approximately four minutes after Stoddard observed the vehicle cross the yellow centerline.

Clark asked Terry Beasley for permission to search the vehicle. Beasley refused. Officers Russell and Clark were told by supervisors "to start a k9 Officer to the car stop." The call for the K9 unit was placed at 7:26, less than half an hour after the stop. Beasley was not allowed to leave.

Detective Jesse Hancock of Wichita Police Department Detective responded to the call for a canine officer, and left his residence at 7:38 p.m. He arrived at the scene eight minutes later, and ran his dog around the defendant's vehicle six minutes after that. The dog alerted to the trunk area. Within the vehicle, officers discovered a safe hidden under some clothing.

The officers told the defendant the safe would be opened, and he said he did not have a code to the safe. He said that the safe had $9,000 in casino winnings.

Approximately an hour after the stop began, a supervising agent told Russell and Clark "to seize the safe and release Terry with a citation." The defendant was released, although no citation was actually issued.

When the safe was later opened at DEA headquarters, officers found two bundles

14

of cash, one of $1,100, and one of $54,000.

### A. Traffic Stop

The defendant argues that the traffic stop was unreasonable, both because the officers had no reason for following the vehicle, citing *United States v. Maldonado*, 614 F.Supp.2d 1179 (D. Kan. 2009), and because there is no evidence that his vehicle indeed committed any lane violation under Kansas law, citing language from *United States v. Gregory*, 79 F.3d 973 (10th Cir. 1996), that "a single lane violation [does] not provide the reasonable suspicion needed for a traffic stop."

The defendant's brief incorrectly indicates that *Maldonado* is a Tenth Circuit case. (Dkt. 250, at 6). It is in fact a District Court decision, which has not been cited by any subsequent decision, other than in two cases distinguishing it. Ultimately, the decisive element of the *Maldonado* decision was the court's conclusion that there was no evidence that the lane violation was dangerous, and thus the defendant could not have violated K.S.A. 8-1522. *See* 614 F.Supp.2d at 1184 ("Last, and most importantly ... unless the lane drift posed a danger to other traffic, there is no violation of K.S.A. 8–1522").

As discussed below, and as explained by this court in *United States v. Valenzuela-Rojo*, 2015 WL5837681 (D.Kan. Oct. 7, 2015), *Maldonado* was rendered obsolete within months by the Kansas Supreme Court's decision in *State v. Marx*, 289 Kan. 657, 215 P.3d 601 (2009), which held that danger is but one of two ways in which a defendant may violate the lane change statute. *See Marx*, 289 Kan. at 674 ("Proof that driving outside the lane markers

15

created no safety hazard is not a defense to the single lane rule"). Thus, as to the decisive element of the *Maldonado* case, its "suggest[ion] that actual danger is an essential element of K.S.A. 8–1522(a), [*Maldonado*] is no longer a correct assessment of Kansas law." *Valenzuela-Rojo*, 2015 WL 5837681, at *4.

Second, *Maldonado* has limited relevance since the decision is factually distinguishable because the court was unable to determine the existence of *any* actual lane violation. *See* 614 F.Supp.2d at 1183 (noting conflict in testimony of the officers and concluding "here there was no violation" of the statute). Such complete evidentiary failures are rare, and the evidence before the court does establish that the defendant's vehicle crossed the centerline.

Third, to the extent the court in *Maldonado* found a distinction between "the subjective motivations of pulling a car over" and "the subjective motivations for following it," no court has followed this distinction, and numerous decisions have explicitly held to the contrary.[5] Such decisions simply recognize that "it is beyond debate that an officer's subjective intent is irrelevant to the probable cause determination." *Mocek v. City of*

---

[5] *See, e.g., United States v. Alberty*, 2014 WL 2159259, *7 ( N.D. Tex. May 23, 2014) ("the mere following of a vehicle by law enforcement officers in no way constitutes a seizure when there is no interference with the individual's freedom of movement" and "the officers' subjective intent is relevant to the court's determination of whether a seizure occurred"); *United States v. Sheffield*, 76 F.Supp.3d 148, 154 (D.D.C. 2014)("whether the officers had a subjective intent to stop the vehicle when they began following it is immaterial"); *United States v. Jones*, 2012 WL 2568200, *7 (M.D. Ala. June 15, 2012) ("Officer Martin's subjective intent and reasons for stopping the vehicle are irrelevant to the court's determination of whether or not there was probable cause to believe Defendant committed a traffic violation").

*Abuquerque*, 2015 WL 9298662, *9 (10th Cir. Dec. 22, 2015). "Once an officer observes a traffic violation, *any subjective motivations he had for following the vehicle or conducting the stop* have no bearing on the Fourth Amendment reasonableness inquiry." *United States v. Rubalcava-Roacho*, 299 Fed.Appx. 792, 795 (10th Cir.2008) (emphasis added).

With respect to the defendant's lane violation argument, the defendant's reliance on *Gregory* is also misplaced. As noted above, more recent decisions such as *Marx* have established that Section 8-1522 may be violated by either an unsafe drifting out of lane or by failure to maintain a lane where it is practicable to do so. The statute actually establishes:

> two separate rules of the road. The first requires a driver to keep entirely within a single lane while traveling on a roadway with two or more clearly marked lanes. That rule is temporarily suspended when it becomes impracticable to stay within the lane markers and when the driver is properly effecting a lane change. Proof that driving outside the lane markers created no safety hazard is not a defense to the single lane rule. The second rule provides that before a driver may change lanes or move from the current lane of travel to another location, he or she must ascertain that the movement can be made with safety. A traffic infraction occurs under K.S.A. 8–1522(a) when either rule of the road is violated.

*Marx*, 215 P.3d at 612. Thus, "we find no support in the statute for conditioning a violation of the single lane rule upon proof that driving outside the lane markers was unsafe." *Id.* at 611.

More importantly, the defendant's focus on the maintaining-a-single-lane statute, K.S.A. 8-1522, is misplaced, as that statute is not the most relevant statute. Kansas law specifically prohibits drivers from operating a vehicle left of the centerline. K.S.A. 8-1514.

Once Beasley's vehicle crossed over the centerline, as was reported to the officers who conducted the stop, the defendant's focus on the single lane statute becomes irrelevant.

In *State v. Garza*, 295 Kan. 326, 286 P.3d 554 (2012), the Kansas Supreme Court reversed a decision to suppress evidence following a traffic stop, in which the district court held that it was not clear that the defendant violated Section 8-1522 in a dangerous fashion. The court stressed that the district court should have considered the suppression motion under Section 8-1514, the statute with which the defendant was actually charged.

> K.S.A. 8–1514 is specific to driving left of center. *See Hopper*, 260 Kan. at 70, 917 P.2d 872; *State v. Chavez–Zbarra*, 42 Kan.App.2d 1074, 1077, 221 P.3d 606 (2009) (applying statute when driver crossed centerline on two-lane road; K.S.A. 8–1522 applies to roads with two lanes traveling same direction). Since the officer testified his reason for the stop was that he saw the car's headlight in the officer's lane on a two-way roadway marked with a double yellow line, and actually used the terminology "left of center," the district court should have applied K.S.A. 8–1514. And contrary to the district court's decision, nothing in K.S.A. 8–1514 suggests the statute applies only to unmarked roads. When a statute is plain and unambiguous, this court looks to its plain language. *State v. King*, 293 Kan. 1057, 1060, 274 P.3d 599 (2012). K.S.A. 8–1514 on its face does not make any restriction for unmarked roads.

295 Kan. at 560.

As the Supreme Court indicated in *Garza*, Section 8-1514, the left-of-center statute, is "plain and unambiguous" — it does not have anything like the ambiguous requirement of Section 8-1522 for maintaining as single lane of travel "as nearly as practicable," which so many courts have struggled with, balancing factors such as wind, rain, and a host of other factors in trying to determine what was "practicable" at a given moment on a given roadway. Indeed, as noted in *Garza*, the district court erred in granting the motion to

suppress evidence when the same court acknowledged that the arresting officer observed a "slight" crossing of the centerline *Id*. at 335.[6] Thus, Section 8-1514 is more of a classic (indeed, literal) bright-line statute: any crossing of the line, even slight, represents a violation.

The driving left-of-center statute has been described by the Kansas Supreme Court as "[a]n absolute liability statute … that does not require any criminal intent." *State v. Hopper*, 260 Kan. 68, , 917 P.2d 872 (1996). The *Hopper* court explicitly agreed with the government's contention that the statute's inclusion of four specific exceptions in § 1514(a) "indicate legislative intent that no other exceptions should exist." The exceptions are:

> (1)  When overtaking and passing another vehicle proceeding in the same direction under the rules governing such movement;
>
> (2)  When an obstruction exists making it necessary to drive to the left of the center of the highway, except that any person so doing shall yield the right-of-way to all vehicles traveling in the proper direction upon the unobstructed portion of the highway within such distance as to constitute an immediate hazard;
>
> (3)  Upon a roadway divided into three (3) marked lanes for traffic under the rules applicable thereon; or
>
> (4)  Upon a roadway restricted to one-way traffic.

None of these exceptions are applicable here. The defendant was not passing, there is no evidence of any obstruction, the roadway was not marked for three traffic lanes, nor

---

[6] The supreme court ultimately remanded the action to the district court for clearer findings, since the lower court concluded both that "'it is my opinion that there was a left of center, although it was slight'" but also that "[i]t may even just barely [have] touched it, *I don't know*.'" 295 Kan. at 335 (quoting and adding emphasis to district court order).

was it a one-way street.

At the hearing, the defendant presented photograph evidence of the intersection where the infraction occurred, which depict the roadway immediately east of the Harry and Greenwich intersection as having two painted median areas, one to the west, which is bounded on each side by a double yellow line, and the second further east, with an outer sold yellow line and an inner dashed line. Citing the Kansas Driving Handbook, defendant argues that crossing the yellow line into the second line would not have been a traffic infraction, since the Handbook permits such left-of-center operation.

The court finds defendant's argument unpersuasive. First, by its own terms the Kansas Driving Handbook is not a controlling or even authoritative explanation of Kansas law. The Handbook contains the explicit disclaimer:

> Portions of this manual have been summarized. Kansas law will take precedence over discrepancies or omissions in the manual. For a complete citation of driver license statutes, refer to Chapter 8, Article 2 of the Kansas Motor Vehicle Act.

The Kansas Court of Appeals has specifically held, with reference to a left-of-center driving infraction, that "we do not consider it [the Kansas Driving Handbook] authority … or even persuasive." *Every v. Jefferson Ins. Co*, 4 Kan.App.2d 715, 720, 610 P.2d 645 (1980)

Even if the Handbook were otherwise an authoritative interpretation of Kansas law, it still would not authorize the infraction observed by Stoddard. The "shared left turn" area of the Handbook cited by the defendant expressly provides that:

> The solid yellow centerline means you cannot use the center lane for passing. The broken yellow centerlines show that vehicles traveling in either direction

may use the center lane *only to make left turns*.

Kansas Drivers Handbook, at 38 (emphasis added). By its own terms, the Handbook permits entry into a shared left turn area only for the purpose of making left turns. At this portion of East Harry, extensive development has occurred on the south side of the street; there has been no development on the north side of the street, which is vacant agricultural land. Despite the semi-rural nature of the area, there are solid curbs on both sides of the roadway, except for driveways and side streets on the south side. The defendant, traveling east, was not using the center lane to make a left turn. Indeed he *could not* have turned left, because the solid curb on the north side of the street physically prevents any such a turn.

In sum, when Stoddard observed the defendant's vehicle cross over the solid yellow centerline, he observed an unjustified violation of the left-of-center statute, K.S.A. 8-1514, and law enforcement was justified in stopping the vehicle.

### B. Probable Cause from the Wiretaps

The defendant also argues that, notwithstanding the validity of the initial stop, the delay in obtaining the canine unit renders the stop illegal in light of *Rodriguez v. United States*, 135 S.Ct. 1609, 1612 (2015). In *Rodriguez*, the Supreme Court recently held, in the case of a dog sniff following a traffic stop, that the delay should not last longer than the time needed to ordinarily effectuate such a stop.

> Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission" – to address the traffic violation that warranted the stop.... Because addressing the infraction is the

purpose of the stop, it may last "no longer than is necessary to effectuate th[at] purpose. Authority for the seizure thus ends when tasks tied to the traffic infraction are – or reasonably should have been – completed.

*Id.* at 1614 (internal citations omitted).

*Rodriguez* was decided after the search of the defendant's vehicle, and the government does not argue that the deployment of the canine was justifiable solely on the basis of the traffic stop itself. Rather, as noted earlier, the agents used the traffic stop as a means of lulling the defendant away from suspecting the existence of wiretaps and in the hopes of obtaining additional grounds for a search.

The government rather argues that the delay in obtaining the canine unit was justified because the officers had independent probable cause to believe that the vehicle contained evidence of criminal activity. Having reviewed all the evidence, the court agrees.

The government points to evidence showing:

- In 2010, a search of a house owned by Terry Beasley found cocaine, marijuana, $26,000, computers, and various digital devices. Terry Beasley's son was present at the time of the search, and told officers that the drugs belonged to Terry Beasley.

- Also in 2010, a search of Terry Beasley's apartment found drug paraphernalia.

- Terry Beasley filed no tax returns between 2005 and 2012, but had a house and made monthly mortgage payments of $1,435 during this period.

- On March 29, 2013, in a call intercepted by law enforcement pursuant to warrant, Terry Beasley and Gerald Beasley discussed the purchase of controlled substances. Later that day, Terry met Gerald at Gerald's restaurant.

- In a telephone call two days later, on April 1, 2013, Gerald Beasley asked Terry Beasley to pay him. They discussed the amount of money owed.

- On April 2, 2013, Gerald Beasley called Terry Beasley and asks whether he wants "one more." Terry Beasley does. The discuss meeting later.

- On April 5, 2013, Gerald Beasley called Terry Beasley and said, "I got that." Terry Beasley asked how many, and Gerald Beasley said, "Whatever you want." Gerald Beasley said Terry Beasley's cost would be 64 per thousand. The defendant states that he has 5400, but he wants to get twice that much.

- In a later telephone call, the defendant orders "8 G's."

The defendant's motion generally acknowledges the state of the evidence as to criminal activity before June, 2013, and indeed acknowledges that there might be evidence that "Mr. Beasley might have *generally* engaged in wrongdoing of various natures over the course of time." (Dkt. 376, at 8 (emphasis in original)). Although the defendant immediately attempts to argue that there was no reasonable suspicion of criminal activity on the actual day of the stop, it is worthwhile to pause for a moment to recognize the defendant's admission: that the government indeed had a reasonable basis for believing that Terry Beasley was generally engaged in criminal enterprises. While the defendant does not acknowledge exactly what these enterprises "of various natures" were, the evidence indicates that these most likely included drug trafficking and money laundering.

Of course, the defendant attempts to discount some of this evidence, but these arguments fail to displace this interpretation of a general background in criminal activity as the most probable explanation of the evidence. Terry Beasley notes for example (Dkt. 376, at 5 (emphasis in original)) that, at the time of the 2010 search, his son Carlos Beasley "did *not* attribute to him the money, computers, and digital devices" — only the narcotics. The defendant stresses that the government's evidence only shows that the expensive monthly mortgage payments "were being made by *somebody*," not necessarily himself. (*Id*.

at 6 (emphasis in original)). In other words, the defendant takes each item sequentially, and argues that this matter by itself does not prove the defendant was guilty of drug trafficking.

The court finds that the investigating officers had probable cause to believe that the defendant was involved in the drug trafficking trade, that this trade involved other members of his family, and that this activity was both longstanding and recent, with specific transactions occurring only weeks before the June 3 traffic stop. The evidence from the intercepts further shows that a large drug transaction involving heroin had occurred in the weeks immediately before the June 3, 2016 seizure, and that the sale resulted in $54,000 in cash proceeds.[7]

Turning from this general background to the evidence acquired the day of the seizure, the government introduced the audio recordings of seventeen telephone calls which were placed between the members of the Beasley family, or between family members and their associates. The calls occurred before the stop, or in the minutes immediately after the stop.[8] The court has reviewed the recordings in detail, and the most

---

[7] The officer knew the transactions involved heroin because Terry Beasley indicated that customers had complained about the product being too sticky, and Gerald told Terry to put the product in the freezer to harden it up. Agent Shauna Sherwood testified that heroin is the only drug which meets this description. In addition, Sherwood testified that, although Terry Beasley says in the wiretap he had $5400, Beasley family members "tried to talk in code" and "would always drop the zero off." As a result, Sherwood believed that Terry Beasley had approximately $54,000 to purchase narcotics.

[8] For example, Call No. 1598, referenced later in this opinion from Antoine to Helen Beasley, was made at 7:02 p.m., within a minute or two of the traffic stop. The supervising case agent monitored all of the calls contemporaneously.

probable interpretation of the conversations is that Terry Beasley was eager to retrieve a very large sum of money, reflecting the criminal proceeds from drug trafficking, from the storage facility.

By far the most probable interpretation of the intercepted conversations is that the storage facility held the proceeds of criminal activity, and that these proceeds were causing dissension among the family. Carlos Beasley (Terry Beasley's son) called Antoine Beasley (Gerald Beasley's son) indicating Terry's eagerness to retrieve his property, but that Helen Beasley (Antoine's mother) had changed the locks, and that "she ain't giving it up, so he a cooked goose."

The property in the storage facility which caused such dissension was clearly dangerous. Carlos was concerned that other family members "threw me under the bus" by involving him. Antoine told his cousin he was "kinda foul," and the two began to exchange threats. Antoine stated that, "for you to sit up there and say, you know, 'its gonna get worse that what it really is' is like, 'if the police ain't gonna get called, the only thing that could really happen is something violent' for you to try to say that, bro' … is out of control." Indicating that he thought Carlos was threatening violence, Antoine promised, "Whatever I gotta do, I'm gonna bring it back to you … whatever that may be."

In a conversation with Isaac Woods, Antoine states that Carlos had threatened him and told him, "This shit gonna get ugly." Antoine also said that he had told his father Gerald Beasley, "You was wrong for even allowing him to put something in there. And that shit is in momma's name."

Antoine called his mother Helen Beasley to discuss the item in the storage facility, which he simply referred to as "whatever that is." Helen indicated that Gerald had called her, and knew "y'all kicking around threats." Helen told Antoine, "I'm going to meet you out there 'cause I changed the lock on mine. And that's where the stuff is going to be, I guess, in mine."

Shortly after that conversation, Helen sent Antoine a text message stating, "I'm going to take the police there."

Antoine called Helen almost immediately, and asked what was going on. Helen responded:

> Got your daddy on the phone with that shit. Talk about, "yeah, well, do whatever you, I ain't got shit in there." I said I'll bring the police out there, since they want to kick around some threats, talk about how it might get ugly, I can make it real ugly.

Antoine told Helen not to call the police, and that "we gonna give them their stuff and that's going to be end of that."

Beasley family members, including the defendant Terry Beasley, made further telephone calls shortly after the traffic stop. Antoine called Helen to report that Terry had been stopped, and she responded with a "Wow." The tone to the response is striking, as Helen Beasley gives no indication of surprise that Terry Beasley was stopped after leaving the storage facility, only that the stop under such circumstances was very serious — far more grave than a typical traffic stop. Antoine also called Gerald Beasley who responds with a similar "Wow," but also indicates his fear that "I figured they go it," and regret that

26

"He should have left it there."

While not decisive itself, the court notes that the consistent, repeated use of euphemisms by the members of the Beasley family simply adds to this understanding of the illicit nature of the "something valuable" held in the storage facility. For example, when speaking of the storage facility, Carlos stresses to Antoine that he didn't tell his father "to put whatever is in there, in there." Under ordinary circumstances, family members discussing the retrieval of, say, a toaster oven from a storage facility would give some indication that they are talking about a toaster oven. Here, it is striking that in *none* of the many intercepted conversations is there *any* specific reference to the property at issue. The constant use of euphemism only buttresses the conclusion that the property held in storage was illicit in nature.

The most likely interpretation of all the evidence is that contraband from the storage facility was located in defendant's vehicle at the time of the stop. The most probable understanding of the telephone calls is that Terry Beasley was engaged in an ongoing series of drug transactions with his brother Gerald, that the brothers were discussing the price of narcotics, and that money was being exchanged between the two. The Beasleys had apparently become aware of the investigation, and were seeking to "cut ties." Terry Beasley in particular was eager to retrieve proceeds from the drug sales which were kept in a Wichita storage facility, and that at the time of the stop he had the proceeds in his vehicle.

Accordingly, the court finds that probable cause existed for seizing the safe at the time of the traffic stop, and denies the defendant's motion to suppress.

IT IS ACCORDINGLY ORDERED this 13th day of April, 2016, that the defendants'

Motions to Suppress (Dkt. 250, 259, 274) are hereby denied.


　　　　　　　　　　　　　　　s/ J. Thomas Marten
　　　　　　　　　　　　　　J. THOMAS MARTEN, JUDGE